STATE OF NORTH CAROLINA v. LORI SHANNON ICARD

No. 236A08

(Filed 18 June 2009)

**Search and Seizure— search of pocketbook—not consensual**

    The trial court erred by denying defendant's motion to suppress evidence seized pursuant to a search of her purse because the search of defendant's purse occurred after she was illegally seized where an officer in a high crime area approached defendant and a companion who were parked in a pick-up truck, requested identification and asked other questions, called for back-up, and ultimately found drug-related items in defendant's purse after she handed it to him when asked. The encounter began legally, but under the totality of the circumstances the officers mounted a show of authority and a reasonable person in defendant's place would have shared the officer's belief that defendant was not free to leave or otherwise terminate the encounter. The trial court erred when it concluded that defendant's interaction with the officers was consensual.

    Justice NEWBY dissenting.

    Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 190 N.C. App. 76, 660 S.E.2d 142 (2008), finding no error in part in a judgment entered on 1 December 2006 by Judge Robert C. Ervin in Superior Court, Catawba County, and remanding for further findings in part. Heard in the Supreme Court 15 October 2008.

**STATE v. ICARD**

[363 N.C. 303 (2009)]

*Roy Cooper, Attorney General, by Derrick C. Mertz, Assistant Attorney General, for the State-appellant.*

*C. Scott Holmes for defendant-appellee.*

EDMUNDS, Justice.

This case presents the question whether a police encounter with defendant triggered defendant's Fourth Amendment protection against unreasonable seizure. We conclude that a reasonable person in defendant's position would not have felt free to refuse an officer's request to search her purse or otherwise terminate the encounter under the totality of circumstances that here included the officer's initiation of the encounter, his declaration to defendant and her companion that he was investigating drug crimes and prostitution, his call for a backup officer, his persistence when defendant did not respond to his initial efforts to make contact, his request that defendant produce identification, and his requests to defendant that she both exit the vehicle with her purse and allow him to ascertain its contents. Accordingly, we determine that defendant was seized within the meaning of the Fourth Amendment. Because the taint of the illegal seizure of defendant had no opportunity to dissipate before the search of her purse, we hold that the trial court erred in denying defendant's motion to suppress.

At defendant's trial, the State presented evidence that at approximately 12:30 a.m. on 21 September 2004, Maiden Police Department Officer Curt Moore drove into the parking lot of Fairview Market, a truck stop on the corner of West Maiden Road and Startown Road in Maiden, North Carolina. Officer Moore considered Fairview Market to be a high crime area because of complaints of prostitution and drug-related activity there. As he entered the parking lot, Officer Moore noticed a pickup truck approximately fifteen feet from the northwest corner of the Fairview Market building. He did not then see anyone in the truck. Although the truck was taking up two spaces, it was not illegally parked.

Officer Moore drove past the truck from behind, then circled the building. As he again approached the truck, he observed a silhouette above the steering wheel that, because of the lighting, he could not identify. Officer Moore parked his police vehicle directly behind the truck with his headlights on and his blue strobe visor lights activated. The truck was not pinned in by the police car. Officer Moore provided the truck's plate number and description to his dispatcher.

Officer Moore, who was in uniform with his service revolver visible, exited his vehicle and walked toward the driver's side door of the truck. As he approached, the driver partially lowered his window and Officer Moore observed two individuals sitting in the truck. He subsequently learned that the driver was Carmen Coleman and the passenger was defendant Lori Icard. Officer Moore requested Coleman's driver's license and vehicle registration and also asked why he and defendant were parked at Fairview Market. Coleman explained that they were from Connelly Springs, North Carolina, and were waiting to meet a friend named Jody who was coming from Taylorsville, North Carolina. Officer Moore advised Coleman that he and defendant were being "checked out . . . because of the numerous complaints of prostitution and drugs in that area." He took Coleman's driver's license and registration back to his police vehicle, where he requested a warrant check, a license check, and backup assistance. Although these checks did not reveal anything suspicious, Officer Moore held on to Coleman's license and registration.

Responding to Officer Moore's call for backup, Officer Darby Hedrick arrived in a marked police car and parked behind Coleman's truck, parallel to Officer Moore's vehicle. Officer Moore turned off his visor lights and Officer Hedrick activated his take-down spotlights to illuminate defendant's side of the truck. Officer Moore approached the truck door on defendant's side, while Officer Hedrick stood behind him at the midpoint of the truck bed.

Officer Moore rapped on defendant's side window with his knuckles, but she did not respond. He rapped again, and when defendant again did not respond, Officer Moore opened the truck door, identified himself as a police officer, and asked if she was carrying identification. Although defendant answered that her ID card was in her other purse, Officer Moore pointed to a small black zippered bag on the truck's floorboard and asked if the ID might be inside. Defendant opened the bag and removed a billfold, from which she produced a North Carolina identification card. Officer Moore looked at the card, then asked defendant to bring her purse with her to the back of the truck, where both officers proceeded to question her. During the questioning, Officer Moore asked if he could look in defendant's purse. She responded by handing it to him. Officer Moore searched the purse and in it found several bullets, a glass tube that appeared burned at one end, and a clear plastic bag containing a residue that was later determined to be methamphetamine.

STATE v. ICARD

[363 N.C. 303 (2009)]

The officers had separated defendant from Coleman to determine whether they gave consistent stories. When Coleman was questioned, Officer Moore took a lockblade clip-type knife from Coleman's pocket. Coleman also handed Officer Moore a clear plastic bag containing marijuana, and another clear plastic bag containing a white-and tan-colored powder. Coleman then struggled briefly and unsuccessfully with Officer Moore. Once Coleman was subdued, a search of the truck revealed glass pipes commonly used to inhale controlled substances, crack pipes, a digital scale, a loaded Rossi .357 pistol, and a transparent yellow plastic bag containing tan powder.

Defendant was charged with resisting and obstructing a law enforcement officer, possession with intent to sell and deliver cocaine, possession with intent to sell and deliver marijuana, possession with intent to sell and deliver methamphetamine, carrying a concealed weapon, and possession of drug paraphernalia. At trial, defendant made an oral motion to suppress the State's evidence. The trial court conducted a *voir dire* hearing on defendant's motion outside the presence of the jury. In addition to the evidence recited above, Officer Moore testified that he had not observed any contraband and did not have a reason to pat down defendant for weapons when he asked her to step out of the truck. Officer Moore believed his encounter with defendant was consensual because she complied with his verbal instructions. However, Officer Moore testified that he did not tell defendant she was free to leave, that in fact she was not free to leave, and that he would not have allowed defendant to walk away from the truck.

The trial court denied defendant's motion to suppress, orally stating that, as a matter of law, defendant was not seized at the time she consented to the search of her purse. In its subsequent written order, the trial court made findings of fact that Officer Moore "did not pat down or frisk the defendant for weapons," "did not threaten the defendant in any way," and "did not place his hand on her at any time." The court also found that while Officer Moore carried a service weapon, "[h]e did not remove that weapon from its holster." Finally, the trial court found that Officer Moore "did not apply physical force, make any threat of force or make a show of authority at any time prior to the discovery of the drug paraphernalia in the defendant's purse," and "did not coerce the defendant's cooperation with his requests." Based upon "the totality of the circumstances," the trial court concluded as a matter of law that "the defendant would not have felt that she was not free to terminate the encounter or decline

STATE v. ICARD

[363 N.C. 303 (2009)]

[Officer] Moore's requests," and that "[b]ased on the totality of the circumstances, the defendant cooperated with [Officer] Moore's requests and her cooperation was not coerced by physical force or a show of authority."

When the case was called for trial, the State voluntarily dismissed the charge of possession with intent to sell and deliver cocaine. Defendant moved to dismiss all the remaining charges at the close of the State's evidence, and the trial court allowed defendant's motion as to the charges of possession with intent to sell and deliver marijuana and carrying a concealed weapon. The court also dismissed the charge of possession with intent to sell and deliver methamphetamine, but found sufficient evidence to support submission of the lesser-included offense of simple possession of methamphetamine. The court denied defendant's motions to dismiss the charges of possession of drug paraphernalia and resisting and obstructing a law enforcement officer. The jury found defendant guilty of simple possession of methamphetamine and acquitted her of the remaining charges.

Defendant appealed her conviction and sentence to the Court of Appeals, arguing the trial court erred in concluding that the episode was a noncoercive encounter between citizen and officer that fell outside the protections of the Fourth Amendment. The Court of Appeals majority found that Officer Moore seized defendant and that, as a result, the search of defendant's purse was subject to Fourth Amendment analysis. *State v. Icard*, 190 N.C. App. 76, 660 S.E.2d 142 (2008). The majority emphasized that defendant did not live near Fairview Market and that to terminate the encounter, defendant would have had to leave the Market and enter a high crime area on foot, after midnight. *Id.* at 84, 660 S.E.2d at 148 ("At 12:30 a.m. in an area known for drug activity and prostitution, any passenger, particularly a female, would undoubtedly have felt uncomfortable or unsafe by attempting to leave the parking lot on foot."). Because the trial court had not made findings of fact as to whether defendant's consent to search her purse was voluntary or coerced, the majority remanded the case to Superior Court, Catawba County for additional findings. *Id.* at 86, 660 S.E.2d at 149.

The dissent argued that the majority's emphasis on the location of the encounter was misplaced and that a police officer's "words and actions" effect a seizure. *Id.* at 89, 660 S.E.2d at 150 (Bryant, J., dissenting) (internal quotation marks omitted). Finding no "show of authority amounting to a restraint on [d]efendant's liberty," the dis-

senting judge would have affirmed the trial court's order denying defendant's motion to suppress. *Id.* at 89-90, 660 S.E.2d at 151. The State appealed to this Court as a matter of right.

On appeal from denial of a motion to suppress, the trial court's findings of fact are binding when supported by competent evidence, while conclusions of law are "fully reviewable" by the appellate court. *State v. Brooks*, 337 N.C. 132, 141, 446 S.E.2d 579, 585 (1994) (internal quotation marks omitted). Here, the trial court made numerous findings of fact that are supported by substantial competent evidence presented at the suppression hearing. However, two of the trial court's concluding three findings of fact are as follows:

> 37. [Officer] Moore did not apply physical force, make any threat of force, or make a show of authority at any time prior to the discovery of the drug paraphernalia in the defendant's purse.
>
> . . . .
>
> 39. [Officer] Moore did not coerce the defendant's cooperation with his requests. Moore did not tell the defendant that she was not free to terminate this interaction.

Although labeled findings of fact, these quoted findings mingle findings of fact and conclusions of law. For instance, that Officer Moore did not apply physical force is a finding of fact, but the statement in Finding No. 37 that Officer Moore's actions did not amount to a show of authority resolves a question of law. The finding that Officer Moore did not tell defendant she was not free to terminate the encounter is a factual matter, but the court's determination in Finding No. 39 that Officer Moore did not coerce defendant is a conclusion of law. While we give appropriate deference to the portions of Findings No. 37 and 39 that are findings of fact, we review de novo the portions of those findings that are conclusions of law. *Id.*

An individual is seized by a police officer and is thus within the protection of the Fourth Amendment when the officer's conduct "would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437, 115 L. Ed. 2d 389, 400 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 100 L. Ed. 2d 565, 569 (1988)) (describing the above-quoted standard as "the crucial test"). A reviewing court determines whether a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter by examining the totality of circum-

stances. *Id.* at 436-37, 115 L. Ed. 2d at 400; *Brooks*, 337 N.C. at 142, 446 S.E.2d at 586.

The totality of circumstances "test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Chesternut*, 486 U.S. at 573, 100 L. Ed. 2d at 572. Moreover, "an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" or otherwise terminate the encounter. *INS v. Delgado*, 466 U.S. 210, 215, 80 L. Ed. 2d 247, 255 (1984) (internal quotation marks omitted); *see also Bostick*, 501 U.S. at 436-37, 115 L. Ed. 2d at 400.

Although the standard is not satisfied when a police officer merely engages an individual in conversation in a public place, *see, e.g.*, *Brooks*, 337 N.C. at 142, 446 S.E.2d at 586, additional circumstances attending such an encounter may reveal that the individual is not participating consensually but instead has submitted to the officer's authority, *see Bostick*, 501 U.S. at 434, 115 L. Ed. 2d at 398 (explaining that a police officer may seize an individual through a "show of authority" that "restrain[s] the liberty of a citizen"). Relevant circumstances include, but are not limited to, the number of officers present, whether the officer displayed a weapon, the officer's words and tone of voice, any physical contact between the officer and the individual, whether the officer retained the individual's identification or property, the location of the encounter, and whether the officer blocked the individual's path. *See, e.g.*, *United States v. Drayton*, 536 U.S. 194, 153 L. Ed. 2d 242 (2002); *Bostick*, 501 U.S. 429, 115 L. Ed. 2d 389; *State v. Farmer*, 333 N.C. 172, 424 S.E.2d 120 (1993).

The State cites *State v. Brooks*, where this Court conducted a totality of the circumstances review of an encounter in which a uniformed SBI agent approached the defendant as he was sitting in the driver's seat of a car parked at a nightclub. 337 N.C. at 136-37, 446 S.E.2d at 583. The driver's door was open and the defendant had been talking with another individual outside the car who hastened away as the agent approached. *Id.* at 142, 446 S.E.2d at 586. The agent observed an empty unsnapped holster within the defendant's reach, and when the agent asked, "Where is your gun?," the defendant responded, "I'm sitting on it." *Id.* at 137, 446 S.E.2d at 583. Under the

STATE v. ICARD

[363 N.C. 303 (2009)]

totality of circumstances present in *Brooks*, this Court held that the agent did not seize the defendant by approaching his open car door and asking a single brief question. *Id.* at 142, 446 S.E.2d at 586. Instead, we concluded that the defendant's response gave the officer probable cause to believe the defendant was carrying a concealed weapon and justified the defendant's arrest. *Id.* at 145, 446 S.E.2d at 588.

In contrast, the encounter between the officers and defendant in the case at bar was significantly longer in duration and more intrusive in substance. The record reveals that much of the evidence presented to the trial court during the *voir dire* hearing regarding the seizure was not contested. According to this uncontested evidence, Officer Moore parked directly behind the vehicle in which defendant was a passenger, with his blue lights flashing. Officer Moore, who was in uniform and armed, told Coleman in defendant's presence that the two were being checked out because the area was known for drugs and prostitution. When Officer Moore requested assistance, Officer Hedrick arrived in a marked police car and used his take-down lights to illuminate defendant's side of the truck. Both officers then approached defendant. When defendant twice failed to respond to Officer Moore's attempts to initiate an exchange, the officer opened defendant's door, compelling contact. Officer Moore requested that defendant produce her identification, then asked defendant to come with her purse to the rear of the vehicle where he and Officer Hedrick continued to ask questions. When Officer Moore left defendant to deal with Coleman, he did not return her purse but instead handed it to Officer Hedrick. The encounter took place late at night, some distance from the address listed on defendant's identification.

Under the totality of these uncontradicted circumstances, we conclude that the officers mounted a show of authority when: (1) Officer Moore, who was armed and in uniform, initiated the encounter, telling the occupants of the truck that the area was known for drug crimes and prostitution; (2) Officer Moore called for backup assistance; (3) Officer Moore initially illuminated the truck with blue lights; (4) Officer Hedrick illuminated defendant's side of the truck with his take-down lights; (5) Officer Moore opened defendant's door, giving her no choice but to respond to him; and (6) Officer Moore instructed defendant to exit the truck and bring her purse. By the time defendant stepped out of the truck at Officer Moore's request, a reasonable person in defendant's place would have shared the officer's belief that she was not free to leave or otherwise terminate the encounter.

*See Bostick*, 501 U.S. at 437, 115 L. Ed. 2d at 400. Therefore, we find the trial court erred when it concluded as a matter of law that defendant's interaction with Officers Moore and Hedrick was consensual.[1]

In so holding, we acknowledge that this encounter between defendant and the officers began legally. Police are free to approach and question individuals in public places when circumstances indicate that citizens may need help or mischief might be afoot. *Terry v. Ohio*, 392 U.S. 1, 22, 20 L. Ed. 2d 889, 906-07 (1968); *State v. Streeter*, 283 N.C. 203, 208, 195 S.E.2d 502, 505-06 (1973). Here, the officers' instincts were sound, as evidenced by Coleman's guilty pleas to several felonies. Nevertheless, because the search of defendant's purse occurred after she was illegally seized but before the taint of the illegal seizure could have dissipated, *see Wong Sun v. United States*, 371 U.S. 471, 491, 9 L. Ed. 2d 441, 457 (1963), we conclude that the trial court erred in denying defendant's motion to suppress the fruits of the search, *see Florida v. Royer*, 460 U.S. 491, 496-97, 75 L. Ed. 2d 229, 235-36 (1983) (plurality).

For the reasons stated above, we affirm that part of the decision of the Court of Appeals which held Officer Moore seized defendant and that, as a result, the search of defendant's purse was subject to Fourth Amendment analysis. We reverse that part of the decision of the Court of Appeals which remanded the matter to Superior Court, Catawba County for additional findings of fact as to whether defendant's consent to search her purse was voluntary or coerced. We remand this matter to the Court of Appeals for further remand to Superior Court, Catawba County with instructions to grant defendant's motion to suppress and for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Justice NEWBY dissenting.

This Court substitutes its judgment for that of the trial court and grants defendant a new trial by re-weighing the evidence and con-

---

1. We do not hold, as the dissent suggests, that the circumstances here "convert" every similar encounter between a law enforcement officer and citizen "to an unlawful seizure." We hold only that the totality of circumstances establishes that defendant was seized. While such seizures are lawful when supported by reasonable articulable suspicion, *see Terry v. Ohio*, 392 U.S. 1, 22 L. Ed. 2d 889 (1968), the State did not argue either at trial or on appeal that particularized suspicion exists in this case. Once defendant was seized, the immediately subsequent search of her purse was not consensual.

STATE v. ICARD

[363 N.C. 303 (2009)]

cluding the search of defendant's purse was illegal because she had been unlawfully seized in violation of the Fourth Amendment. This decision fails to give proper deference to the factual findings of the trial court and misapplies federal and state jurisprudence long understood to mean that not all personal exchanges between police officers and citizens involve a seizure. The Court's analysis also leaves law enforcement officers without adequate guidance needed to enable them to enforce the laws of the State and protect its citizens. Because I believe the evidence supports the decision of the trial court that defendant voluntarily consented to the search of her purse, I respectfully dissent.

The standard of review under which we evaluate the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law. *See, e.g., State v. Brooks*, 337 N.C. 132, 140-41, 446 S.E.2d 579, 585 (1994). The trial court's findings "are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001). The trial court determines the credibility of the witnesses who testify, weighs the evidence, and determines the reasonable inferences to be drawn therefrom. *Knutton v. Cofield*, 273 N.C. 355, 359, 160 S.E.2d 29, 33 (1968). If different inferences may be drawn from the evidence, the trial court decides which inferences to draw and which to reject. *Id.* Appellate courts are bound by the trial court's findings if there is some evidence to support them, and may not substitute their own judgment for that of the trial court even when there is evidence which could sustain findings to the contrary. *In re Montgomery*, 311 N.C. 101, 110-11, 316 S.E.2d 246, 252-53 (1984). "Where the findings of fact support the conclusions of law, such findings and conclusions are binding upon us on appeal." *State v. Wynne*, 329 N.C. 507, 522, 406 S.E.2d 812, 820 (1991) (citations and internal quotation marks omitted). ·

At trial, the encounter with defendant was described by Officer Curt Moore of the Maiden Police Department, a twenty-two year veteran of law enforcement who had previously worked for the North Carolina State Highway Patrol, the Hickory Police Department and the Catawba County Sheriff's Department. On 21 September 2004, Officer Moore was on duty as a supervisor of the night patrol division, which required him to monitor the security of businesses and people within the city limits and to address any problems that arose during the shift. One such business was the Fairview Market, a gas

station and sandwich shop situated at the intersection of West Maiden Road and Startown Road in Maiden, North Carolina. On the side of the building that faced the road was a large, private parking lot for automobiles and tractor-trailers containing three rows of parking spaces. Two "No Trespassing" signs were posted on either side of the front of the building stating that violators after business hours would be subject to law enforcement by the Town of Maiden. Officer Moore recalled that this particular area was known for its high rate of criminal activity, that there had been numerous complaints regarding drugs and prostitution in the area, and that he had made several arrests there.

At approximately 12:30 a.m., Officer Moore pulled into the parking lot of the Fairview Market to perform an after-hours check of the premises because the business had closed at 10:00 p.m. While turning into the lot, he noticed only one vehicle there—a pickup truck pulled diagonally across two parking spaces in the front row within fifteen feet of the side of the building. Although the truck was not parked illegally, the abnormal positioning caused Officer Moore to observe it more closely as he drove past. When his headlights crossed through the back windshield, the cab of the truck appeared to be unoccupied. Officer Moore continued past the truck and circled around the building. As he rounded the front corner of the building, his headlights illuminated the front windshield of the truck and he saw a silhouette about six inches above the steering wheel.

Officer Moore drove around the truck and, upon parking behind it, noticed movement in the cab. He stated that although the truck would have been unable to back up because his car was parked directly behind it, it could have freely driven forward at any time to leave the lot. Officer Moore was driving a low-profile police car which had police department decals on each side but did not have the standard light bar on top of the roof. In order to identify himself as a police officer, he left his headlights on and activated his blue visor lights. He then called the Catawba County Justice Center to give them a description of the vehicle and the license plate number. As Officer Moore approached the driver's side of the truck, he noticed a passenger, who was later identified as defendant. The driver partially rolled down his window to speak with Officer Moore and eventually opened his door to continue the conversation. After examining his driver's license and registration, Officer Moore asked the driver his purpose for being there. The driver responded that they had come from Connelly Springs to meet their friend "Jody" who was driving

down from Taylorsville. Officer Moore inquired further because the Fairview Market in Maiden seemed to be an illogical and geographically inconvenient place to meet, or in his words, "way out of the way." He also informed the occupants of the truck that his purpose for speaking with them was related to the numerous complaints regarding drugs and prostitution in the area. At that point, he returned to his police car with the driver's license and registration to begin an "identification process," which he testified is a standard procedure when the police find a vehicle at a business after hours. Because there were two occupants in the truck, Officer Moore called his secondary patrol officer, Officer Darby Hedrick, and requested that he report to the location as back-up. Officer Moore waited in his vehicle for results of the identification process and for Officer Hedrick to arrive.

After a minute or two, the license, registration, and warrant checks were verified. Officer Moore turned off his blue visor lights before approaching the vehicle for a second time, this time on the passenger side where defendant was sitting. By that time Officer Hedrick had arrived and parked his marked police car parallel to the right side of Officer Moore's car with his headlights and stationary, front-facing spotlights shining toward the truck. Officer Moore briefly explained the situation to Officer Hedrick before they approached the truck. When he got to the passenger's door, Officer Moore attempted to gain defendant's attention by tapping on the window with his knuckle, but defendant did not respond. Officer Hedrick remained several feet away, near the middle or rear of the truck bed. Officer Moore tapped on the window a second time, and when defendant again did not respond he opened the truck door, identified himself, and requested her identification. Defendant replied that she did not have a driver's license or identification card with her because it was in another purse. However, visible at her feet on the floorboard was what appeared to be a purse. Officer Moore asked if there were any forms of identification in the purse. Defendant replied that she did not think it contained any, but voluntarily reached down, picked up the bag, and unzipped it. Immediately visible near the top of the bag was a bifold wallet from which defendant produced a North Carolina identification card. Officer Moore asked defendant if she would step out of the truck and bring her purse to the rear of the vehicle where Officer Hedrick was standing. Defendant agreed, and as she walked towards the rear of the truck she was still "fumbling" through her purse. Officer Moore asked defendant for permission to look through the bag and then inquired

as to whether there was anything in the purse that she needed to tell him about. Defendant answered in the negative, consented to a search of the bag, and handed it to the officer. Visible in the center of the bag, lying loose on top of some other items, was the blackened end of a glass pipe which, based on Officer Moore's training and experience, appeared to be a "crack pipe." Officer Moore also saw an open pouch that held some bullets and the other end of the glass pipe, and a clear plastic bag with a stamp of a skunk on the outside containing a substance that later tested positive for methamphetamine. Before he could finish the interview with defendant, Officer Moore was distracted by suspicious movements in the cab of the truck by the driver, who appeared to be sliding towards the passenger side. He handed the purse to Officer Hedrick and walked around to the driver's side of the truck where he was involved in an altercation with the driver. The incident resulted in the arrest of both defendant and the driver, and a search of the vehicle that yielded a loaded handgun, a knife, drugs, and drug paraphernalia.

Based upon this evidence, the trial court made the following pertinent findings of fact:

19. When Moore arrived at the passenger door of the truck, he tapped on the window. The defendant did not respond. Moore knocked on the window a second time and the defendant again did not respond.

20. Moore identified himself to the defendant and he was wearing his police uniform at the time of this incident.

21. Moore then opened the passenger door of the truck.

22. Moore asked the defendant for her identification.

23. The defendant told Moore that she had left her identification in another purse.

24. Moore observed a purse or bag in the floorboard of the Dodge truck at her feet.

25. Moore asked about that purse and the defendant said that she didn't think her identification was in that purse.

26. The defendant then reached down and unzipped the purse. There was a bi-fold billfold on top and the defendant fumbled through it.

27. The defendant produced her [identification card] for Officer Moore.

28. Moore then asked the defendant to step out of the Dodge truck.

29. Once the defendant got out of the truck, Moore asked her to accompany him to the back of the truck. The defendant complied with Moore's request.

30. Moore asked the defendant if he could look in her purse and if there was anything in her purse that she needed to tell him about.

31. The defendant said no and handed her purse to Officer Moore.

32. When Moore looked inside of the defendant's purse he observed a piece of glass pipe and several bullets. The glass tube had a burned or smoked area on one end. Moore was of the opinion, based on his training and experience, that the glass pipe was a crack pipe.

. . . .

34. Moore did not pat down or frisk the defendant for weapons.

35. Moore did not threaten the defendant in any way and he did not place his hand on her at any time.

36. Moore had a handgun on his person. He did not remove that weapon from its holster.

37. Moore did not apply physical force, make any threat of force or make a show of authority at anytime prior to the discovery of the drug paraphernalia in the defendant's purse.

38. The defendant consented to producing her identification to Officer Moore and she agreed to go to the back of the truck. The defendant also agreed to permit Moore to examine the contents of her purse.

39. Moore did not coerce the defendant's cooperation with his requests. Moore did not tell the defendant that she was not free to terminate this interaction.

Based on these findings of fact, which were supported by competent evidence, the trial court made the following conclusions of law:

1. No one is protected by the Constitution against the mere approach of police officers in a public place. *State v.*

*Campbell*, 359 N.C. 644, 662, 617 S.E.2d 1 (2005); *State v. Brooks*, 337 N.C. 132, 141, 446 S.E.2d 579 (1994).

2. Thus, a communication between the police and citizens involving no coercion or detention falls outside the compass of the Fourth Amendment. *Brooks*, 337 N.C. at 141.

3. Police officers may approach individuals in public to ask them questions and even request consent to search their belongings, so long as a reasonable person would understand that he or she could refuse to cooperate. *Brooks*, 337 N.C. at 142.

4. A seizure does not occur simply because a police officer approaches an individual and asks a few questions. Such encounters are considered consensual and no reasonable suspicion is necessary. *Campbell*, 359 N.C. at 662; *Brooks*, 337 N.C. at 142.

5. The test for determining whether a seizure has occurred is whether under the totality of the circumstances a reasonable person would feel that he was not free to decline the officers' request or otherwise terminate the encounter. *Brooks*, 337 N.C. at 142.

6. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred. *Campbell*, 359 N.C. at 662.

7. Based on the totality of the circumstances, the defendant would not have felt that she was not free to terminate the encounter or decline Moore's requests.

8. Based on the totality of the circumstances, the defendant cooperated with Moore's requests and her cooperation was not coerced by physical force or a show of authority.

Each of the trial court's conclusions is supported by the findings of fact and is based upon an accurate assessment of the law. As previously stated by this Court, " 'not all personal intercourse between policemen and citizens involve 'seizures' of persons.' " *State v. Campbell*, 359 N.C. 644, 662, 617 S.E.2d 1, 13 (2005) (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386, 115 L. Ed. 2d 389, 398 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16, 20 L. Ed. 2d 889, 905 n.16 (1968))), *cert. denied*, 547 U.S.

1073, 126 S. Ct. 1773, 164 L. Ed. 2d 523 (2006). It is well established that " '[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.' " *Campbell*, 359 N.C. at 662, 617 S.E.2d at 13 (quoting *United States v. Drayton*, 536 U.S. 194, 200, 122 S. Ct. 2105, 2110, 153 L. Ed. 2d 242, 251 (2002) (alteration in original)). An encounter is consensual and does not constitute a seizure "[S]o long as a reasonable person would feel free to disregard the police and go about his business." *Campbell*, 359 N.C. at 662, 617 S.E.2d at 13 (quoting *Bostick*, 501 U.S. at 434, 111 S. Ct. at 2386, 115 L. Ed. 2d at 398 (quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S. Ct. 1547, 1552, 113 L. Ed. 2d 690, 698 (1991)). " 'Only when the officer, by means of physical force or show of authority has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' " *Id.* (quoting *Bostick*, 501 U.S. at 434, 111 S. Ct. at 2386, 115 L. Ed. 2d at 398 (quoting *Terry*, 392 U.S. at 19 n.16, 88 S. Ct. at 1879 n.16, 20 L. Ed. 2d at 905 n.16)).

In determining whether the officer's actions constituted a show of authority that implicates the protections of the Fourth Amendment, the question is "not whether the citizen *perceived* that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a *reasonable person.*" *California v. Hodari D.*, 499 U.S. at 628, 111 S. Ct. at 1552, 113 L. Ed. 2d at 698 (emphasis added) (citation omitted). This objective test permits a trial court to conclude that a seizure has occurred "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497, 509 (1980); or to "decline the officers' requests or otherwise terminate the encounter," *Bostick*, 501 U.S. at 438, 111 S. Ct. at 2389, 115 L. Ed. 2d at 402. Likewise, the Fourth Amendment does not include a consideration of the officer's subjective intent, and his motive will not "invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Whren v. United States*, 517 U.S. 806, 812-13, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89, 98 (1996) (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 1723, 56 L. Ed. 2d 168, 178 (1978)).

In *Mendenhall*, the Supreme Court of the United States enumerated several circumstances that could support the trial court's determination that a show of authority had occurred, such as "the threat-

ening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554, 100 S. Ct. at 1877, 64 L. Ed. 2d at 509 (citation omitted). Hearing live testimony, the trial court is in the best position to weigh the evidence. In the case *sub judice*, the trial court properly considered each of these circumstances and made detailed findings that Officer Moore did not make a show of authority during the encounter. Pursuant to current Fourth Amendment jurisprudence, the trial court's decision should be affirmed because it is based on sound factual findings and an accurate application of the law.

The majority, however, isolates two phrases in the trial court's findings, characterizes them as conclusions of law, re-weighs the evidence, and makes its own findings to support its conclusion that defendant was seized and her consent involuntary. As noted in the majority opinion, "The totality of the circumstances 'test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, *rather than to focus on particular details of that conduct in isolation*.' " (emphasis added) (citation omitted). After correctly stating the applicable test, the majority then misapplies it. The trial court made thirty-nine detailed findings of fact, considering the encounter between defendant and Officer Moore in its full context; the majority focuses on two "particular details of th[e] conduct in isolation." After discussing the circumstances of the encounter, the trial court states in Finding 37: "Moore did not apply physical force, make any threat of force or make a show of authority at anytime prior to the discovery of the drug paraphernalia in the defendant's purse." In Finding 39, the trial court states: "Moore did not coerce the defendant's cooperation with his requests. Moore did not tell the defendant that she was not free to terminate this interaction." The majority admits that most of these statements are factual, yet determines the findings, "Moore did not . . . make a show of authority" and "Moore did not coerce the defendant's cooperation with his requests," are conclusions of law. However, as noted by the trial court, even these two findings contain both factual and legal components. This duality was considered by the trial court as it analyzed the "show of authority" and "coercion" elements in its findings of fact and conclusions of law. Viewed in the context of the other findings of fact, there is competent evidence to support the trial court's factual determinations that Officer Moore did not "make a show of authority" and "did not coerce the defendant's cooperation,"

and these findings should not be subject to de novo review. Instead of looking at the totality of the circumstances, the majority isolates these two findings, which have both factual and legal components, ignores the role of the trial court in weighing the factual nature of the findings, and substitutes its own judgment for that of the trial court before which the testimony was given.

Considering the totality of the circumstances, the trial court found in Finding 38: "The defendant consented to producing her identification to Officer Moore and she agreed to go to the back of the truck. The defendant also agreed to permit Moore to examine the contents of her purse." In assessing the voluntariness of the search, the majority ignores this crucial finding and recharacterizes the critical events of the encounter between Officer Moore and defendant. When Officer Moore opened the door of the truck and asked defendant for her identification, she did not communicate any desire for the encounter not to occur. She responded to his question and stated she did not have any identification, having left it in a purse at home. Officer Moore noticed the purse on the floor of the truck and asked defendant if her identification could be in it. The encounter could have ended at that juncture. A reasonable person would have believed she could have terminated the encounter, having stated that she left her identification at home. Defendant, nonetheless, voluntarily picked up the purse and opened it. Disproving defendant's prior statement, the identification was in the top of the purse. Contrary to the evidence and the findings by the trial court, the majority characterizes these critical events of the encounter by simply stating: "Officer Moore requested that defendant produce her identification." After voluntarily opening the purse and revealing her identification, defendant agreed to exit the truck, bringing her purse with her. As explicitly found by the trial court, defendant then consented to the search of her purse.

The majority concludes with a list of six events it determines amounted to a show of authority, converting the voluntary encounter to an unlawful seizure. This analysis could well describe most police encounters. Further, it again reweighs the evidence, substituting the judgment of an appellate court for that of the trial court that heard the testimony. The first event listed is "Officer Moore, who was armed and in uniform, initiated the encounter . . . ." Defendant was in a truck parked in a public area outside a closed business. Under these circumstances an officer should investigate. The driver of the truck could have driven away, but chose to stay. Further, it is almost invari-

able that law enforcement officers will be "armed and in uniform." These circumstances do not preclude voluntary cooperation. As the case law directs and as observed by the trial court, the pertinent inquiry is whether the officer did more than simply have his weapon in its holster. The next factor is that "Officer Moore called for backup assistance." It is standard procedure to have backup when the initial officer observes more than one individual in a vehicle. In hindsight, having backup was prudent as the officers subsequently determined there was a loaded pistol in the truck. The majority also finds pertinent the fact that "Officer Moore initially illuminated the truck with blue lights." While Officer Moore at first utilized his blue visor lights to identify himself as a police officer, he subsequently turned them off before his encounter with defendant. Similarly, the majority's test includes the finding that "Officer Hedrick illuminated defendant's side of the truck with his take-down lights," however, the use of Officer Hedrick's spotlights was necessary for the safety of all in the dimly lit parking lot.

The final elements relied upon by the majority are newly minted factual determinations based on its interpretation of the evidence. The majority states that "Officer Moore opened defendant's door, giving her no choice but to respond to him." Although Officer Moore's actions made a response from defendant likely, there is nothing in the record that requires a finding that he gave her "no choice but to respond to him," and the trial court did not so hold. As stated above, this finding is contradicted by the facts as found by the trial court; defendant had the opportunity to decline further interaction, but voluntarily picked up her purse, opened it, and produced her identification. Whereas the majority says, "Officer Moore instructed defendant to exit the truck," the trial court found the officer "asked the defendant to step out of the . . . truck" and that she did so voluntarily. From these circumstances, the majority concludes that defendant was seized "by the time [she] stepped out of the truck at Officer Moore's request." However, the evidence and factual findings support the trial court's conclusion that defendant voluntarily interacted with Officer Moore, willingly exited the truck, and consented to the search of her purse. While a trial court might have found the facts as the majority has done, the trial court in this case did not. The majority's re-weighing of the evidence in order to support its determination that defendant was seized violates our standard of deference to the trial court.

Considered in light of the facts as found by the trial court, the actions of the law enforcement officer were supported by law. While

the truck in this case was not violating any traffic laws, Officer Moore is permitted by law to approach a person or vehicle in a public place, *Bostick*, 501 U.S. at 434, 111 S. Ct. at 2386, 115 L. Ed. 2d at 398, ask questions of the driver and passenger, including their reasons for being there, if they are willing to listen, *Drayton*, 536 U.S. at 200, 122 S. Ct. at 2110, 153 L. Ed. 2d at 251, request to examine the individuals' identification, *see INS v. Delgado*, 466 U.S. 210, 216, 104 S. Ct. 1758, 1762, 80 L. Ed. 2d 247, 255 (1984), and request consent to search their luggage, *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 1323-24, 75 L. Ed. 2d 229, 236-37 (1983), so long as the officer does not use coercion or require compliance with the requests. *Bostick*, 501 U.S. at 435, 111 S. Ct. at 2386, 115 L. Ed. 2d at 398-99. Officer Moore was properly and legally performing his duties when he stopped to investigate the lone vehicle parked in the Fairview Market's parking lot after business hours.

In order to protect citizens from unlawful seizures while still effectively enforcing the criminal laws of our State, this Court must provide clear guidance so that law enforcement officers are able to determine when they must terminate an investigative encounter or articulate a reason for continuing. The majority opinion fails to give the useful instruction needed by our law enforcement officers and our trial courts.

I believe competent evidence supports the trial court's findings of fact, and the findings of fact support the conclusions of law. The trial court's holding that defendant voluntarily consented to the search of her purse should be affirmed. I respectfully dissent.