IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-165

No. COA20-536

Filed 15 March 2022

Cleveland County, No. 18CRS051578

STATE OF NORTH CAROLINA

v.

JUANITA MULLINAX, Defendant.

Appeal by Defendant from judgment entered 22 November 2019 by Judge J. Thomas Davis in Cleveland County Superior Court. Heard in the Court of Appeals 7 September 2021.

*Attorney General Joshua H. Stein, by Associate Attorney General Robert J. Pickett, for the State.*

*Shelly Bibb DeAdder for the Defendant.*

DILLON, Judge.

¶ 1    Defendant was charged with possession of methamphetamine after drugs were found inside her pants pocket during an encounter with law enforcement officers in a retail store parking lot. She later pleaded guilty to the charge after her motion to suppress was denied. On appeal, she challenges the trial court's denial of her suppression motion. We conclude that some of the trial court's key findings are not supported by the evidence. Accordingly, we vacate and remand to allow the trial court

to make additional findings and conclusions consistent with the evidence and this opinion.

## I. Appellate Jurisdiction

¶ 2         We note that Defendant's attorney gave oral notice of appeal of the denial of the suppression motion rather than the final judgment. *See State v. McBride*, 344 N.C. 623, 476 S.E.2d 106 (1996) (affirming *per curiam* an opinion holding that the notice of appeal must be from the final judgment rather than from the order denying a suppression motion). Defendant, however, has petitioned our Court for writ of *certiorari*. In our discretion, we grant Defendant's petition.

## II. Standard of Review

¶ 3         In reviewing the denial of a motion to suppress, we evaluate whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law. *State v. Brooks*, 337 N.C. 132, 141, 446 S.E.2d 579, 585 (1994). "[I]t is the *appellant* who has the burden in the first instance of demonstrating error from the record on appeal." *State v. Adams*, 335 N.C. 401, 409, 439 S.E.2d 760, 764 (1994).

## III. Factual Background

¶ 4         A uniformed deputy (the "Deputy") approached Defendant while she sat in her car in a parking lot. The Deputy believed Defendant to be a Ms. McConnell, who was the subject of outstanding arrest warrants. During the encounter, Defendant

provided the Deputy with her driver's license ID.

Five (5) minutes later (roughly eight (8) total minutes into the encounter), after determining that Defendant was not Ms. McConnell and confirming that Defendant otherwise had no outstanding warrants, the Deputy returned to Defendant's car, but failed to return the ID to her. Defendant was standing outside the vehicle while the Deputy asked for consent to search her vehicle. In any event, a full fifty (50) seconds later, another deputy (the "Backup Deputy") approached Defendant and the Deputy and noticed what he suspected were drugs in Defendant's pocket. The Backup Deputy pulled Defendant aside and asked to search her pocket, whereupon he retrieved a bag containing methamphetamine. She was subsequently placed under arrest.

## IV. Analysis

Defendant was clearly in violation of the law by possessing illegal drugs. Defendant, however, argues that the trial court erred in denying her motion to suppress the drugs, contending that she was illegally seized at the point of the encounter when the Backup Deputy saw the drugs in her pocket. Notwithstanding the evidence of her guilt from the body cam videos worn by the deputies, we must review her rights under the Fourth Amendment of the Constitution, which protect all citizens against unreasonable search and seizure from the government. Indeed, the North Carolina Supreme Court has recognized the "exclusionary rule," that "evidence derived from an unconstitutional search or seizure is generally inadmissible in a

criminal prosecution of the individual subjected to the constitutional violation." *State v. McKinney*, 361 N.C. 53, 58, 637 S.E.2d 868, 872 (2006).

¶ 7        The trial court made findings regarding the encounter.  Defendant challenges several of them.  We focus on two of the findings challenged by Defendant.  Specifically, the trial court found that Defendant was never "seized," because she was free to leave at any time.  Also, the trial court essentially found that no gap in time occurred between the time the Deputy returned to Defendant's car with Defendant's license in hand, and the time when the Backup Deputy walked over to Defendant's vehicle and discovered the drugs in Defendant's pocket.

## A. Defendant Was Seized

¶ 8        The Supreme Court of the United States has recognized that not every encounter between a citizen and a law enforcement officer is a seizure:

> Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual, and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.

*Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quotations and citations omitted).

¶ 9        The North Carolina Supreme Court has recognized that the test for determining whether a seizure has occurred is whether, under the totality of circumstances, a "reasonable person would feel free to decline the officer's request or

otherwise terminate the encounter." *State v. Icard,* 363 N.C. 303*,* 308-09, 677 S.E.2d 822, 826 (2009) (citing *Bostick*, 501 U.S. at 436-37). That Court has instructed that "relevant circumstances include, but are not limited to, the number of officers present, whether the officer displayed a weapon, the officer's words and tone of voice, any physical contact between the officer and the individual, whether the officer retained the individual's identification, or property, the location of the encounter, and whether the officer blocked the individual's path." *Id.* at 309, 677 S.E.2d at 827.

¶ 10    The body cam videos are part of the record. Below is a summary of the events as portrayed in the videos. For instance, the videos show the Deputy reapproach Defendant without returning her ID to her at the 8 minute, 19 second (8:19) mark, and the Backup Deputy discovering the drugs fifty (50) seconds later at the 9:09 mark. The body cam videos show as follows:

0:30    The Deputy gets out of his patrol car and approaches Defendant, who is sitting in her car with the driver's side door opened. He asks Defendant if he could speak with her.

Immediately, Defendant receives a cellphone call from her niece. She answers to let her know where in the parking lot she is. Defendant tells the Deputy that she is meeting her niece in the parking lot to borrow money from her.

1:12    While Defendant is on the phone, the Officer directs Defendant to "ask" her niece to drive over to where they are parked. Defendant then tells her niece that she is parked next to a police vehicle.

1:30    While Defendant is still on the phone, the Deputy directs Defendant to "tell" her niece to drive over to where they are

parked.

1:50    Defendant hangs up. Her niece has now pulled up, parked several feet on the other side of the police car from where Defendant is parked and the Deputy is standing.

2:10    Defendant again tells the Deputy she is there to borrow money from her niece. The Deputy then walks over to the niece's car and asks her why she is there. She responds that she is there to lend money to Defendant.

2:35    The Deputy walks back over to Defendant, who is still in her car, and asks her for her name. She responds truthfully. He asks her for identification, which she immediately and freely gives.

2:45    The Deputy tells her why he stopped her, that he recognized the car as one owned by a man who was a person of interest in drug crimes and is also occasionally driven by a Ms. McConnell, the subject of outstanding arrest warrants.

2:57    The Deputy looks at Defendant's ID and states that he sees that Defendant is not Ms. McConnell. He retains the ID.

3:02    Defendant tells the Deputy that she babysits for the car owner, who let her borrow the car to meet her niece, and that she knows Ms. McConnell.

3:40    The Deputy asks Defendant if there are drugs in the car. She states that she has no idea, as the car is not hers.

3:55    The Deputy then leaves Defendant and walks over to her niece and asks her for her name. He then goes to his police car.

4:03    The Deputy gets into his police car and runs a warrants/records check on Defendant's ID. He remains in his car for almost 2 minutes.

5:50    The Deputy gets out of his police car and walks back over to the niece's car.

6:27    The Deputy asks the niece for her ID, which she freely gives. Another marked patrol car pulls up and parks between the niece's car and the Deputy's car. The Backup Deputy and a third deputy (the "Junior Deputy") get out of the second police car. The Deputy tells the Backup Deputy about the vehicle he has pulled over.

7:00    The Deputy gets back into his car with Defendant's ID and the niece's ID and runs a check, presumably on the niece's ID.

8:08    The Deputy goes back to the niece's car and hands the niece's ID to the Backup Deputy. He tells the Backup Deputy that Defendant's story about borrowing money from her niece "adds up" but that he is going to ask Defendant to let him search the car. The Backup Deputy hands the niece her ID, staying with her and engaging in polite conversation with her.

8:19    *(This begins the key point of the encounter, over four (4) minutes after the deputy had last spoken to Defendant.)* The Deputy goes back to Defendant's car and asks if he can search it. He still retains Defendant's ID. He tells Defendant that she needs to be honest as to whether there are drugs in the car. She again tells him that she does not know, as the car is not hers.

At some point the Backup Deputy breaks off his polite conversation with the niece, telling her he is going to see what is going on with the Deputy and Defendant. As he is leaving the niece, he instructs the Junior Deputy to stay with and "watch" the niece. The Junior Deputy can be seen walking toward the niece's car, where the niece's driver door is still opened.

9:09    *(This is also a key point of the encounter, occurring 50 (fifty) seconds after the Deputy asked to search Defendant's car, while retaining Defendant's ID.)* The Backup Deputy arrives at Defendant's car where Defendant is speaking with the Deputy about searching her car. The Backup Deputy testified that at some point after walking over to Defendant's car, he noticed a plastic bag through a hole in Defendant's pocket and that he could see what appeared to be methamphetamine in the plastic bag.

The video is not conclusive on this point, but the trial court found this as fact.

9:44   Defendant gives consent to search the car but then begins to say something, at which point the Backup Deputy asks Defendant to walk about ten (10) feet away next to the passenger side of the Deputy's car so that they could talk. As she walks away, the Deputy begins his search. But before talking to her, the Backup Deputy walks back over to the Deputy and states, "I'm trying to keep her busy. She was about to revoke [unintelligible]."

10:00  The Backup Deputy then asks Defendant if he can search her person. After some talking, she states that she does not mind.

10:30  The Backup Deputy immediately reaches in one of Defendant's pockets and pulls out a plastic bag.

10:55  The Backup Deputy states that he saw the bag when he had walked up to the car a few minutes before. He asks her if that was "dope." She responds, "Apparently."

¶ 11      The initial few moments of the encounter had all the hallmarks of a consensual encounter. The Deputy did not activate his lights, he did not block Defendant's exit, he did not object to Defendant answering her phone, and he asked her politely if he could speak with her.

¶ 12      However, a little over a minute into the encounter, the tenor changed, and some attributes of a seizure began to appear. That is, circumstances developed between the 1:08 mark and the 8:19 mark of the encounter that would cause a reasonable person in Defendant's position to believe she was not free to leave.

¶ 13      The first circumstance that would indicate a seizure occurred a little over a

minute into the encounter, was when the Deputy directed Defendant to ask and then tell her niece to drive over to where they were parked. He was calm in his tone, but his desire to have Defendant stay put and have her niece come to where they were parked was stated grammatically in the form of commands. *See State v. Farmer*, 333 N.C. 172, 187, 424 S.E.2d 120, 129 (1993) (whether a seizure has occurred may depend, at least in part, on whether "the use of language . . . indicat[es] that compliance with the officer's request might be compelled").

¶ 14      Around the 2:45 mark, the Deputy walked away from Defendant with her ID in hand *after* stating that he was satisfied she was not the wanted woman (Ms. McConnell) whom he was looking for, but without asking her for consent to walk away with it. He returned to Defendant more than five (5) minutes later. Case law suggests that a reasonable person who is away from their home in her car would generally not feel free to drive away and go about her business without her license and would, therefore, be seized. *See State v. Parker*, 256 N.C. App. 319, 326-27, 807 S.E.2d 617, 621-22 (2017); *see also State v. Jackson*, 199 N.C. App. 236, 243, 681 S.E.2d 492, 497 (2009).[1] Also, the fact that the Deputy spent almost two minutes

_____

[1] We note that the Fourth Circuit, which includes North Carolina but whose cases are not binding on our Court, has stated that the fact that one's driver's license is retained during a traffic stop "is a highly persuasive factor in determining whether a seizure has occurred." *United States v. Weaver*, 282 F.3d 302, 311 (4th Cir. 2002). In *Weaver*, the Court reasoned that if the police retained one's license during a traffic stop, "the citizen would be [caught]

inside his patrol car away from Defendant rather than checking on any warrants in Defendant's presence is a circumstance that tends to indicate Defendant would not feel free to leave, as she would not be in a position during those two minutes to ask for her license back. *See, e.g., United States v. Analla*, 975 F.2d 119, 124 (4th Cir. 1992) (no seizure occurred because, in part, the officer "did not take the license into his squad car, but instead stood beside the car, near where [the defendant] was standing [such that the defendant] was free at this point to request that his license . . . be returned and to leave the scene"); *see also Golphin v. State*, 945 So.2d 1174, 1200-01 (Fla. 2006) ("The difficulty in securing the return of an identification from an officer who has retreated to a closed police vehicle may contribute to the defendant's sense of being detained.")

Also, during these five (5) minutes, the Backup Deputy and the Junior Deputy arrived on the scene. Our Supreme Court has stated that multiple uniformed officers on the scene would contribute to a defendant's sense of being subject to a seizure. *Icard,* 363 N.C. at 309, 677 S.E.2d 827.

---

between the Scylla of consent to the encounter [and] the Charybdis of driving away and risk being cited for driving without a license." *Id.* at 311. The Court then cited other circuit cases holding that one is *per se* seized if, during a traffic stop, the officer retains the suspect's license beyond that which is required. *See United States v. Mendez*, 118 F.3d 1426, 1430 (10th Cir. 1997) (noting bright-line rule in the traffic stop context); *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) (same); *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990) (same); *United States v. Jefferson*, 906 F.2d 346, 349 (8th Cir. 1990) (same).

¶ 16     We conclude that the encounter became a seizure at some point prior to the Deputy returning to Defendant's vehicle at the 8:19 mark.  This is not to say that the seizure had been illegal.  Indeed, it was permissible for the Deputy to determine that Defendant was not Ms. McConnell, and, perhaps take Defendant's license to run a warrants check.

### B. Discovery of Drugs

¶ 17     The resolution of Defendant's motion, however, turns on what occurred between the 8:19 mark—when the Deputy finally returned to Defendant—and the 9:09 mark, when the Backup Deputy left the niece and arrived at Defendant's car and saw the illegal drugs in Defendant's pocket.  Indeed, our Supreme Court has instructed that, based on recent precedent from the United States Supreme Court, "a law enforcement officer may not detain a person even momentarily without reasonable, objective grounds for doing so."  *State v. Reed*, 373 N.C. 498, 508, ___ S.E.2d ___, ___ (2020) (internal marks omitted) (citing *Royer*, 460 U.S. at 497-98.).

¶ 18     It is unchallenged that the Deputy retained Defendant's license after reapproaching her at the 8:19 mark.  We conclude that she remained seized at this point, as she would not have felt free to ignore the Deputy and leave, even with her niece.[2]

---

[2] The trial court found that law enforcement's encounter with the niece "was

¶ 19      The question then becomes whether the seizure had been unconstitutionally prolonged by the time the Backup Deputy noticed the drugs in her pocket. The trial court found that *at the same time* the Deputy "returned to the defendant with her license to request a search of the car, [the Backup Deputy] was then forming his reasonable suspicion that the defendant possessed illegal narcotics, thereby justifying a change and extension of the scope and purpose of the stop for further investigation." Defendant challenges this finding, and the body cams clearly and conclusively show that the Deputy was alone with Defendant for fifty (50) seconds—from the 8:19 mark to the 9:09 mark—before the Backup Deputy had finished talking with the niece and walked over to where Defendant and the Deputy were standing.

¶ 20      This case is similar to *State v. Parker*. In that case, we held that a motion to suppress should have been allowed where two officers separated the defendant from a companion during an encounter; the officers checked the defendant's license and

---

completed" by the 8:19 mark and, therefore, Defendant was free to leave her car in the parking lot and ride away with her niece without her driver's license. However, the trial court failed to specifically find that a reasonable person in Defendant's position would have known that her niece was free to leave and, therefore, she could (1) ignore the Deputy who had just walked over to her, still retaining her license; (2) walk over to her niece's car several yards away; (3) get into the car with her niece; and (4) be driven away. Indeed, the body cam videos themselves do not show that Defendant had any way of knowing that her niece was not seized. At the 8:19 mark when the Deputy returned to Defendant, the other deputies remained with her niece with the niece's driver's door open, with the Backup Deputy blocking the door at times. When the Backup Deputy left the niece to walk toward Defendant, he tells the Junior Deputy to stay with the niece and to "watch" her.

determined she had no warrants; the officers, however, retained possession of the license and asked to search her car; and narcotics were found during the search. *Parker*, 256 N.C. App. at 321-23, 807 S.E.2d at 619-20. Specifically, we held that "[a]bsent a reasonable suspicion and articulable suspicion to justify further delay, retaining defendant's driver's license beyond the point of satisfying the purpose of the initial detention . . . was unreasonable." *Id.* at 327, 807 S.E.2d at 622.

## V. Conclusion

¶ 21    Defendant's encounter with the deputies became a seizure at some point prior to the drugs being detected by the Backup Deputy. The initial justification for the seizure disbanded fifty (50) seconds before the Backup Deputy discovered the drugs. The trial court never made findings in this regard, as the trial court incorrectly found that Defendant was never seized.

¶ 22    We, therefore, vacate the order and remand to the trial court to make additional findings concerning whether there was any other justification for the deputies to extend the seizure for fifty (50) seconds beyond the time the Deputy reapproached Defendant's car or, otherwise, whether any exception to the exclusionary rule might apply. If not, the trial court will allow Defendant's motion to suppress and strike Defendant's conditional guilty plea.

VACATED AND REMANDED.

Judge TYSON concurs.

Chief Judge STROUD concurs in result only.