IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1269

Filed: 15 October 2019

Cabarrus County, Nos. 18 JA 72, 73, 74

IN THE MATTER OF: J.C.M.J.C., J.J.C.C., C.O.C.

Appeal by Respondents from order entered 24 August 2018 by Judge William

G. Hamby, Jr. in Cabarrus County District Court. Heard in the Court of Appeals 5

September 2019.

*Hartsell & Williams, PA, by H. Jay White and Austin "Dutch" Entwistle III, for Petitioner-Appellee Cabarrus County Department of Human Services.*

*Garron T. Michael for Respondent-Appellant Mother.*

*Mary McCullers Reece for Respondent-Appellant Father.*

*Parker, Poe, Adams & Bernstein L.L.P., by R. Bruce Thompson II, for Guardian ad Litem.*

COLLINS, Judge.

Respondents appeal from an order adjudicating their minor children "Jillian",

"John", and "Catherine" (collectively, "the children") neglected.[1] We reverse.

On or about 25 April 2018, the Cabarrus County Department of Human

Services ("CCDHS") received a Child Protective Services ("CPS") report alleging that

8-year-old John and 5-year-old Catherine were frequently seen playing outside alone

---

[1] Pseudonyms are used to protect the juveniles' identities. *See* N.C. R. App. P. 42(b).

after school; Respondent-Father ("Father") smoked marijuana in front of the children; Respondent-Mother ("Mother") was pregnant and may also have been smoking; and the odor of marijuana was detectible from the family's apartment. On 2 May 2018, CCDHS received another CPS report alleging that the family could be heard yelling; there was suspected domestic violence in the home; and the home was unclean and lacked furniture.

CCDHS made multiple unsuccessful attempts to reach Respondents by phone, by mail, and by visits to the residence. Although a social worker spoke to John and Catherine at their school and verified Respondents' address and telephone number, CCDHS was unable to contact Respondents or observe 1-year-old Jillian. Respondents did not respond to CCDHS's phone messages or to multiple "speed messages" left by CCDHS at their apartment.

On 4 May 2018, CCDHS filed a petition[2] under N.C. Gen. Stat. § 7B-303 (2017) accusing Respondents of obstructing or interfering with a juvenile investigation. After a hearing on 7 May 2018, the trial court found Respondents had obstructed or interfered with CCDHS's investigation without lawful excuse and entered a "Juvenile Interference Order" ordering Respondents to allow CCDHS access to their home and the children. The trial court entered additional interference orders after hearings on

---

[2] Although the record on appeal contains only the interference petition filed in Jillian's case, 18 JA 72, the caption of the trial court's interference orders lists all three juveniles and their corresponding case numbers.

14 and 21 May 2018, finding that CCDHS had made additional attempts to contact Respondents by phone and in person and that Father had "told CCDHS to go away and stop harassing the family."

On 22 May 2018, CCDHS obtained nonsecure custody of Respondents' children and filed a petition alleging they were neglected juveniles within the meaning of N.C. Gen. Stat. § 7B-101(15) (2017). After a hearing on 12 July 2018, the trial court entered an "Adjudication/Disposition Order" on 24 August 2018 adjudicating the children neglected, continuing them in CCDHS custody, and approving their existing foster placements. The trial court ordered Respondents to obtain psychological, parenting capacity, and substance abuse assessments and comply with any recommended treatment; submit to random drug screens requested by CCDHS; obtain and maintain sufficient income and suitable housing for the children; provide financial support for the children consistent with state law; attend supervised visitations as prescribed in the order; and remain in bi-weekly contact with their social worker. Respondents each filed timely notice of appeal from the trial court's order.

## I. Subject Matter Jurisdiction

As an initial matter, we note the record on appeal lacks copies of the juvenile petitions purportedly filed by CCDHS with regard to John and Catherine in file

numbers 18 JA 73 and 74.[3] "A trial court's subject matter jurisdiction over all stages of a juvenile case is established when the action is initiated with the filing of a properly verified petition." *In re T.R.P.*, 360 N.C. 588, 593, 636 S.E.2d 787, 792 (2006). Contrary to the requirements of Appellate Rule 9, the record on appeal thus fails to demonstrate the trial court's jurisdiction over the subject matter in 18 JA 73 and 74. *See* N.C. R. App. P. 9(a)(1)(c)-(d) (2018) (requiring record to contain "a copy of the summons with return, or of other papers showing jurisdiction of the trial court . . . or a statement showing same" and "copies of the pleadings . . . on which the case or any part thereof was tried").

Our Supreme Court has established the following doctrine applicable to this circumstance:

> "When the record shows a lack of jurisdiction in the lower court, the appropriate action on the part of the appellate court is to arrest judgment or vacate any order entered without authority." . . . Contrarily, "when the record is silent and the appellate court is unable to determine whether the court below had jurisdiction, the appeal should be dismissed."

*State v. Petersilie*, 334 N.C. 169, 175-76, 432 S.E.2d 832, 836 (1993) (quoting *State v.*

---

[3] Also absent from the record are copies of any summonses issued or returned in 18 JA 73 and 74. This omission does not affect our review, however, inasmuch as Respondents' participation in the trial court proceedings without objection "'waives any defects in the jurisdiction of the court for want of valid summons or of proper service thereof.'" *Youngblood v. Bright*, 243 N.C. 599, 602, 91 S.E.2d 559, 561 (1956) (quoting *In re Blalock*, 233 N.C. 493, 504, 64 S.E.2d 848, 856 (1951)).

*Felmet*, 302 N.C. 173, 176, 273 S.E.2d 708, 711 (1981)).

Because the record on appeal in this case is silent with regard to the trial court's subject matter jurisdiction in 18 JA 73 and 74, we dismiss Respondents' appeal in these cases. *See Felmet*, 302 N.C. at 176, 273 S.E.2d at 711. Pursuant to our discretionary authority under N.C. Gen. Stat. § 7A-32(c) (2017), however, we elect to review Respondents' arguments on appeal by writ of certiorari. *See State v. Phillips*, 149 N.C. App. 310, 314, 560 S.E.2d 852, 855 (2002); *Gibson v. Mena*, 144 N.C. App. 125, 127, 548 S.E.2d 745, 746 (2001).

## II. **Respondents' Arguments on Appeal**

Respondents both claim the trial court erred in adjudicating the children neglected juveniles. They assert that many of the trial court's findings of fact in support of its adjudication were not grounded in clear and convincing evidence as required by N.C. Gen. Stat. § 7B-805 (2017). Respondents further argue that the findings supported by the hearing evidence do not support the court's conclusion that the children are neglected.

We review an adjudication of neglect to determine whether the trial court's findings of fact are based on clear and convincing competent evidence and whether the trial court's findings support its conclusions of law. *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). Uncontested findings are deemed to be supported by the evidence and are binding on appeal. *Koufman v. Koufman*, 330 N.C.

93, 97, 408 S.E.2d 729, 731 (1991). Erroneous findings unnecessary to the adjudication may be disregarded as harmless. *In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006). The determination that a child is "neglected" is a conclusion of law we review de novo. *In re J.R.*, 243 N.C. App. 309, 312-13, 778 S.E.2d 441, 443-44 (2015).

The Juvenile Code defines "[n]eglected juvenile," in relevant part, as a child under eighteen years of age "whose parent . . . does not provide proper care, supervision, or discipline; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15).

> In order to adjudicate a child to be neglected, the failure to provide proper care, supervision, or discipline must result in some type of physical, mental, or emotional impairment or a substantial risk of such impairment. Similarly, in order for a court to find that the child resided in an injurious environment, evidence must show that the environment in which the child resided has resulted in harm to the child or a substantial risk of harm. A trial court's failure to make specific findings regarding a child's impairment or risk of harm will not require reversal where the evidence supports such findings.

*In re K.J.B.*, 248 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) (internal quotation marks and citations omitted).

In adjudicatory findings 2 and 6 of the Adjudication/Disposition Order, the trial court summarized the CPS reports received by CCDHS on 25 April 2018 and 2 May

2018. The trial court found the following additional facts in support of its conclusion that Respondents' children are neglected:

> 3. Starting on April 26, 2018, CCDHS had gone to the home numerous times for a home visit without success. Each time a speed message was left requesting that the family contact CCDHS or comply with court. When CCDHS would return the next time the speed messages are always removed. CCDHS spoke with [Respondents] who refused to cooperate with the investigation. CCDHS could not ensure the safety and well-being of the children due to the injurious environment, substance use and improper supervision. [John] and [Catherine] were last seen at the Concord Children's Clinic on March 16, 2018. The Concord Children's Clinic had no records for [Jillian, born in May 2017].
>
> 4. On April 30, 2018, CCDHS [went to John and Catherine's school and] verified the family's correct phone numbers and address. School person[nel] reported that the children had missed several months of school in Florida prior to transferring to Cabarrus County Schools. School person[nel] reported that [Mother] was sending harassing, threatening, harsh and demeaning emails to the teachers, in such that all communication now went directly to the school princip[al]. School personnel reported that the children were academically behind; however, they were very capable of catching up as long as they attended school regularly. School personnel reported that the children were enrolled in school in January 2018 and had missed 21 days as [sic] of school prior to April 30, 2018.
>
> 5. On May 1, 2018, CCDHS sent a certified letter to the family requesting contact upon receipt of the letter. On May 4, 2018, CCDHS received the receipt that the letter was picked up by [Father].
>
> . . . .

7. On May 4, 2018, CCDHS filed an Obstruction of a Juvenile Investigation petition. On May 7, 2018, the [trial court] entered an order instructing [Respondents] to cease obstruction of the CCDHS investigation regarding the juveniles and allow CCDHS access to the residence of the juveniles, as well as access to the children.

8. On May 5, 2018, CCDHS arrived at the residence to find that Concord Police Department was on scene responding to a call from [Mother]. Officers on scene verified that [Mother] was in the apartment as she was observed yelling and cursing and instructed to go back into her residence. CCDHS attempted entry to the home by knocking loudly several times with no response.

9. On May 9, 2018, CCDHS arrived at the residence and was able to speak with [Father,] who answered the door [and] stated "stop harassing and threatening us" . . . . CCDHS was able to observe [Father] open the door so that [John] and [Catherine] could enter from the bus. CCDHS was able to see the 1-year-old [Jillian] standing next to [Mother] on the sofa. [Father] stated "that his wife would call when she is good and ready" and closed the door in the Social Worker's face.

10. On May 10, 2018, CCDHS and Concord Police Department arrived at the residence and was able to speak with [Father] . . . . CCDHS attempted to initiate the case and asked to come in; however, [Father] stated "no" and "why would I let a stranger into my home". CCDHS attempted to explain the report allegations; however, [Father] would not allow CCDHS to complete the initiation. A Concord Police Officer spoke with [Father] who later agreed to a home visit . . . [at] 1:00 pm on May 11, 2018.

11. On May 11, 2018, CCDHS arrived at the residence at 1:07 pm and knocked on the door. CCDHS could hear clutter and commotion behind the door; a male voice asked "who is it" and a female voice responded "them". CCDHS

waited several minutes and knocked again. [Father] finally answered the door and reported that CCDHS could come in however the Concord Police officer was not allowed in the home. CCDHS did not enter the residence due to safety concerns. . . .

12. On May 17, 2018, CCDHS went to the school and met with [John] and [Catherine]. School person[nel] reported that the family was on an attendance contract and the children had 22 absences. . . . [T]he children stated "that they don't have anything to say to CCDHS".

13. Upon information and belief, [Father] had been observed smoking marijuana outside and around the children; that [Mother] beat the children for no reason and yelled at them for no reason; and that [Father] threatened young children and made them cry in the neighborhood.

14. On May 18, 2018, CCDHS received a lengthy voicemail from [Mother] stating "you went up to the school today and interviewed my children privately and I want to know what was discussed and any pictures you took of my children against their will and ours as well cause we did not say that you could; . . . anything you need to say to me you can leave it on the piece of paper that you leave in the hallway when you drop off information . . . . On May 19, 2018, CCDHS contacted [Mother] who reported that she was at a doctor's appointment and would call back later.

15. On May 18, 2018, CCDHS was contacted by school person[nel] reporting that [Mother] was being banned from all Cabarrus County property including bus stops. [Mother] verbally attacked the school bus driver and was standing in the door way keeping other children from boarding the bus. [Mother] was being charged with Misdemeanor Trespass/Impede School Bus. School person[nel] stated that several children, including [John and Catherine], were on or around the bus.

Finding 1, which states "[t]he allegations contained in the petition support a finding that the juveniles are neglected[,]" is in the nature of a conclusion of law and will be reviewed accordingly. *See State v. Icard*, 363 N.C. 303, 308, 677 S.E.2d 822, 826 (2009).

## A. Findings of Fact

Respondents collectively challenge Findings 3-6, 8-11, and 13-15 as unsupported by the evidence adduced at the adjudicatory hearing. They note CCDHS called just one witness, social worker Nicole Cleur, and tendered no additional exhibits or documentary evidence in support of the petition's allegations.[4]

Ms. Cleur's testimony comprises fourteen transcript pages and focuses largely on CCDHS's inability to investigate the CPS reports due to Respondents' refusal to cooperate with the investigation. Our review of her testimony reveals evidentiary support for some portions of the trial court's findings. She described the contents of the 25 April 2018 CPS report in a manner consistent with Finding 2. Ms. Cleur further attested to the following: CCDHS's unsuccessful attempts to contact Respondents in order to conduct its investigation as set forth in Finding 3; her contact with John and Catherine at school as stated in Findings 4 and 12; the report from

---

[4] Contrary to its representation on appeal, CCDHS did not tender its "Disposition Report" to the trial court during the adjudicatory stage of the hearing, but at the subsequent, dispositional stage. *See In re A.W.*, 164 N.C. App. 593, 597, 596 S.E.2d 294, 296-97 (2004) (concluding that a Department of Social Services report that "was not introduced into evidence during the brief adjudicatory phase of the hearing" could not provide evidentiary support for the trial court's adjudicatory findings).

school personnel that John and Catherine were academically behind and had missed 21 days of school as stated in Finding 4; and CCDHS's filing of a juvenile interference petition and the trial court's entry of the Juvenile Interference Order against Petitioners as stated in the first sentence of Finding 7. Although Ms. Cleur also testified that she personally smelled marijuana outside Respondents' residence and that John and Catherine "and their belongings" smelled of marijuana when they were interviewed at school, the trial court's findings do not reflect this testimony.[5]

CCDHS and the guardian ad litem ("GAL") contend the remainder of the trial court's adjudicatory findings are supported by the court's own prior orders in the cause, specifically by the findings in the 10 May 2018 Juvenile Interference Order and in the "First Seven Day Hearing Order" on nonsecure custody entered by the trial court on 16 June 2018. *See* N.C. Gen. Stat. § 7B-506 (2017). CCDHS shows that each of the challenged adjudicatory findings appears *verbatim* in the "First Seven Day Hearing Order." Given these identical findings, CCDHS insists there can be no "reasonable dispute" that "the trial court took judicial notice of its prior orders . . . ."

---

[5] Nor would the odor of marijuana detected at Respondents' residence or on the children's clothing or effects support an adjudication of neglect, absent additional evidence that the children were exposed to marijuana or otherwise placed at substantial risk of harm as a result of Respondent's marijuana use. *See In re K.J.B.*, 248 N.C. App. at 356-57, 797 S.E.2d at 519 (reversing adjudication of neglect where "there is no substantial evidence to show [the child] suffered any physical, mental, or emotional impairment, or that he was at a substantial risk of suffering such impairment, as the result of Respondent's substance abuse"); *In re E.P.*, 183 N.C. App. 301, 305-07, 645 S.E.2d 772, 774-76 (concluding the Department of Social Services "failed to present clear and convincing evidence that the parents' [substance abuse] problems created a substantial risk of harm to the children"), *aff'd per curiam*, 362 N.C. 82, 653 S.E.2d 143 (2007).

Respondents point out that the trial court did not purport to take judicial notice of its prior orders at the adjudicatory hearing; nor was it asked to do so.[6] Even if the trial court based its adjudicatory findings on its own prior non-adjudicatory findings, Respondents argue that "judicial notice of prior orders is not a replacement for the petitioner's burden to present clear and convincing evidence at the adjudicat[ory] hearing that the children were neglected." Otherwise, Respondents suggest, "there would be no need for a petitioner to present any further evidence" at an adjudicatory hearing under N.C. Gen. Stat. § 7B-805. A petitioner could simply ask the court to adjudicate a juvenile as abused, neglected, or dependent "through judicial notice of prior non-adjudicatory orders."

It is well-established that a trial court may take judicial notice of its own proceedings. *E.g.*, *Georgia-Pacific Corp. v. Bondurant*, 81 N.C. App. 362, 367, 344 S.E.2d 302, 306 (1986); *see also* N.C. Gen. Stat. § 8C-1, Rule 201 (2017). "Further, while it is the better practice to give express notice to the parties of the intention to take judicial notice of matters contained in the juvenile's file, it is not required." *In re D.S.A.*, 181 N.C. App. 715, 719, 641 S.E.2d 18, 21 (2007). Given the absence of hearing evidence to support most of the trial court's adjudicatory findings, and the fact that these findings are identical to findings in the court's earlier orders in the

---

[6] Because the trial court never indicated its intention to take judicial notice of any material, Respondents had no occasion to request an opportunity to be heard on the matter as provided by N.C. Gen. Stat. § 8C-1, Rule 201(e). We find CCDHS's assertion to the contrary unpersuasive.

cause, we agree with CCDHS that the record tends to show the court took judicial notice of the prior proceedings. *See In re M.N.C.*, 176 N.C. App. 114, 120-21, 625 S.E.2d 627, 632 (2006).

Virtually all of the adjudicatory findings challenged by Respondents have *verbatim* equivalents in the "First Seven Day Hearing Order" entered on 30 May 2018. We note, however, that the trial court's prior orders provide no support for the statement in adjudicatory Finding 3 that John and Catherine were last seen at the Concord Children's Clinic on 16 March 2018 and that the clinic lacked any records for Jillian. This finding is likewise unsupported by Ms. Cleur's hearing testimony. Therefore, we will disregard this portion of Finding 3 for purposes of our review. *See In re T.M.*, 180 N.C. App. at 547, 638 S.E.2d at 240.

Notwithstanding the trial court's plenary authority to take notice of its own orders, we agree with Respondents that it is problematic to allow the trial court's findings of fact in the "First Seven Day Hearing Order" to serve as the sole evidentiary support for the great majority of the adjudicatory findings in the "Adjudication/Disposition Order."[7] It is true, as CCDHS emphasizes, that the trial court made the findings in the "First Seven Day Hearing Order" by clear and convincing evidence, the same standard of proof that applies at an adjudicatory

---

[7] Finding 6, which recaps the CPS report received on 2 May 2018, is also supported by the verified petition filed by CCDHS on 22 May 2018, a document also subject to judicial notice as part of the trial court case file.

hearing. *See* N.C. Gen. Stat. §§ 7B-506(b), -805. Unlike at the adjudicatory hearing, however, the trial court was "not . . . bound by the usual rules of evidence" at a seven-day hearing on nonsecure custody. N.C. Gen. Stat. § 7B-506(b); *see also* N.C. Gen. Stat. § 7B-804 (2017) (providing "the rules of evidence in civil cases shall apply" at the adjudicatory hearing in a juvenile abuse, neglect, or dependency proceeding). Furthermore, Respondents had no right to appeal from the "First Seven Day Hearing Order" under N.C. Gen. Stat. § 7B-1001(a) (2017). There is thus no way to ensure that the findings in the "First Seven Day Hearing Order" were based on evidence admissible for purposes of an adjudication. To allow the trial court to find adjudicatory facts simply by taking judicial notice of its prior findings in the nonsecure custody order risks insulating the adjudicatory findings from appellate review and undermines the procedural safeguards for adjudications prescribed by N.C. Gen. Stat. §§ 7B-804 and 7B-805.[8]

## B. **Conclusion of Law**

---

[8] We acknowledge the decisions of this Court allowing the trial court to take judicial notice of its prior orders "from hearings where the evidence was subject to a lower standard of evidentiary proof." *In re J.B.*, 172 N.C. App. 1, 16, 616 S.E.2d 264, 273 (2005). We cited "the well-established supposition that the trial court in a bench trial is presumed to have disregarded any incompetent evidence," *id.* (citation and quotation marks omitted), as well as the lack of indication in the record that "the trial court failed to conduct the independent determination" of the facts for purposes of the adjudication. *In re J.W.*, 173 N.C. App. 450, 456, 619 S.E.2d 534, 540 (2005). Here, however, most of the trial court's adjudicatory findings are unsupported by *any evidence* other than the "First Seven Day Hearing Order." The record would thus appear to show the court failed to undertake an "independent determination" of these facts.

Even assuming *arguendo* that the findings in the trial court's prior orders suffice to support the corresponding adjudicatory findings, we agree with Respondents that the findings do not support the trial court's conclusion that the children are neglected juveniles. Many of the court's purported findings merely recite allegations or reports made to CCDHS during its investigation and thus "are not even really facts." *In re O.W.*, 164 N.C. App. 699, 702, 596 S.E.2d 851, 854 (2004); *cf. Dunlap v. Clarke Checks, Inc.*, 92 N.C. App. 581, 584, 375 S.E.2d 171, 174 (1989) ("Findings of fact that merely restate a party's contentions or testimony without finding the facts in dispute are not adequate."). As we have explained:

> When a trial court is required to make findings of fact, it must make the findings of fact specially. The trial court may not simply recite allegations, but must through processes of logical reasoning from the evidentiary facts find the ultimate facts essential to support the conclusions of law.

*In re Harton*, 156 N.C. App. 655, 660, 577 S.E.2d 334, 337 (2003) (internal quotation marks and citations omitted).

Findings 2, 4, 6, 12, and 15 repeat a variety of allegations made to CCDHS about Respondents, including the contents of the CPS reports or things "reported" by "school person[ne]l." Similarly, Finding 13 attributes certain actions to Respondents "[u]pon information and belief" rather than actual knowledge. Such accounts do not constitute affirmative findings of fact that would support a conclusion that the children are neglected. *See In re O.W.*, 164 N.C. App. at 702-04, 596 S.E.2d at 854.

Where the trial court did make affirmative findings, as in Findings 3, 5, 8-11, and 14, they largely describe Respondents' obstruction of the CCDHS investigation by refusing to communicate with CCDHS and denying access to the children and the home. These findings do not support a conclusion that Respondents did "not provide proper care, supervision, or discipline[,]" or that the children were living in an environment injurious to their welfare. N.C. Gen. Stat. § 7B-101(15); *cf. In re Stumbo*, 357 N.C. 279, 282-83, 582 S.E.2d 255, 258 (2003) (distinguishing between conduct constituting neglect and conduct interfering with investigation of reported neglect under N.C. Gen. Stat. § 7B-303); *cf. In re K.C.G.*, 171 N.C. App. 488, 495, 615 S.E.2d 76, 80 (2005) (concluding the filing of a petition alleging parental interference with an investigation under N.C. Gen. Stat. § 7B-303 does not allow the trial court to place a juvenile in nonsecure custody under N.C. Gen. Stat. § 7B-503 (2017)).

The few findings that arguably bear on the question of whether the children are neglected fail to establish neglect. Finding 8, that Concord police observed Mother "yelling and cursing" at the residence on 5 May 2018, and Finding 15, that Mother "verbally attacked the school bus driver" and blocked school children from boarding the bus on 18 May 2018, both speak to the quality of the children's home environment. But they are not enough to support a determination that the children are neglected.

To the extent Findings 4 and 12 may be construed as affirmative statements that John and Catherine missed 21 or 22 days of school, these findings are also insufficient to establish neglect. "It is fundamental that a child who receives proper care and supervision in modern times is provided a basic education[,]" and a child is neglected within the meaning of the Juvenile Code "when he is *deliberately refused* this education[.]" *In re McMillan*, 30 N.C. App. 235, 238, 226 S.E.2d 693, 695 (1976) (emphasis added). In *In re McMillan*, however, the children were held out of school altogether and did not "receive any mode of educational programs alternative to those in the public school."[9] *Id.* at 236, 238, 226 S.E.2d at 694, 695.

In *In re R.L.G.*, 816 S.E.2d 914 (N.C. Ct. App. 2018), this Court held that evidence that the child had missed 25 days of school and was tardy 37 times during the school year was insufficient to show that the child was neglected by virtue of being denied a basic education. *Id.* at 918-19. In vacating the trial court's order adjudicating the child neglected, this Court looked to the absence of "findings as to

---

[9] In an unpublished case, this Court has held that a child's frequent absences from school may amount to the denial of a sound basic education. *See In re W.W.*, 219 N.C. App. 224, 722 S.E.2d 14, 2012 WL 538941 (2012) (unpublished) (affirming adjudication of neglect where the respondent was unable to take the child to school and would not allow her to ride the school bus; the child had 75 absences in the first half of the school year, 52 of which were unexcused; and the respondent reneged on an attendance agreement and did not return the child to school prior to the juvenile petition being filed). Generally, however, "the essence of [a juvenile] petition is not to enforce the compulsory school attendance law but to determine and provide for the needs of the children." *In re McMillan*, 30 N.C. App. at 237, 226 S.E.2d at 695. Parents who violate our state's compulsory attendance statute are subject to criminal prosecution under N.C. Gen. Stat. § 115C-380 (2017). Excessive school absences may also be addressed by the initiation of an undisciplined juvenile proceeding under N.C. Gen. Stat. 7B-1500 *et seq.*. *See* N.C. Gen. Stat. § 7B-1501(27)(a) (2017).

the reasons for [the child's] missed classes and tardiness or as to how many of [the child's] absences were excused" or "find[ings] that [the child's] failure to pass three classes directly resulted from her absences or from Respondent's failure to provide proper care, supervision, or discipline." *Id.* at 919.

In the present case, the trial court did not make findings contextualizing the children's absences from school in a way showing the children's neglect as a result of being denied an education, and no evidence was presented that could support such findings. Ms. Cleur testified that she went to John and Catherine's school on 30 April 2018 and learned that, "from January 2018 to April 30th, 2018, the children had missed 21 days of school." When asked how the children were doing in school, she replied, "[t]he children were academically behind. Uhm, they had missed several months in school prior in their Florida school they were trying to catch up in their subjects." Ms. Cleur did not provide a reason for the children's missed classes, identify how many of their absences were unexcused, or explain the degree to which the children were "academically behind." Nor did Ms. Cleur give a timeframe for the children's "several months" of missed school in Florida or provide any details about the circumstances of those absences. This evidence, taken as true, does not show John and Catherine are neglected as a result of being denied an education.

### III. Conclusion

Because the trial court's findings of fact fail to support a conclusion that the children are neglected, we reverse the adjudication of neglect. We do not remand the cause for additional fact-finding, because we conclude the evidence adduced at the adjudicatory hearing would not support the necessary findings. *See Harnett Cty. ex rel. De la Rosa v. De la Rosa*, 240 N.C. App. 15, 25, 770 S.E.2d 106, 113 (2015) ("In some cases, we may remand a case to the trial court to make additional findings of fact based upon the evidence presented, but here, the lack of findings is due to the lack of evidence itself."); *see also Sergeef v. Sergeef*, 250 N.C. App. 404, 410, 792 S.E.2d 192, 196 (2016). Having reversed the adjudication, we must also reverse the resulting disposition. *In re K.J.B.*, 248 N.C. App. at 357, 797 S.E.2d at 519.

We recognize Respondents' actions frustrated CCDHS's ability to gather evidence in this case. But such misconduct is insufficient to allow a conclusion that the children did not receive proper care or lived in an injurious environment. CCDHS has means at its disposal to gather additional evidence, including obtaining a contempt order for Respondents' failure to comply with the non-interference orders entered in this case. *See* N.C. Gen. Stat. § 7B-303(f).

REVERSED.

Chief Judge MCGEE and Judge MURPHY concur.