IN THE SUPREME COURT OF NORTH CAROLINA

No. 395PA19

Filed 17 July 2020

IN THE MATTER OF: J.S., C.S., D.R.S., D.S.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 11 July 2019 by Judge Jeanie R. Houston in District Court, Wilkes County, and on writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review an order entered on 10 September 2018 by Judge William F. Brooks in District Court, Wilkes County. This matter was calendared for argument in the Supreme Court on 19 June 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Vannoy, Colvard, Triplett & Vannoy, P.L.L.C., by Daniel S. Johnson, for petitioner-appellee Wilkes County Department of Social Services.*

*Robert C. Montgomery for appellee Guardian ad Litem.*

*Peter Wood for respondent-appellant mother.*

MORGAN, Justice.

Respondent-mother appeals from the trial court's orders terminating her parental rights to the minor children Donald, Jimmy, Charles, and Dora.[1] By order

---

[1] We use pseudonyms chosen by respondent to protect the juveniles' identities and for ease of reading. We note that the trial court also terminated the parental rights of the respective fathers of Donald, Jimmy, and Charles, none of whom are a party to this appeal. Dora's father relinquished his parental rights prior to the institution of these proceedings.

entered on 28 October 2019, this Court granted respondent's petition for writ of

certiorari to review the trial court's 10 September 2018 permanency planning order

which eliminated reunification with respondent from the children's permanent plans

and relieved petitioner Wilkes County Department of Social Services (DSS) from

further efforts to reunify respondent with her children. We now affirm the trial court's

orders in their entirety.

*Factual Background and Procedural History*

On 9 May 2016, DSS obtained nonsecure custody of respondent's children and

filed juvenile petitions alleging that they were neglected based on the following:

> Several [Child Protective Services] reports have c[o]me into
> the Wilkes DSS office . . . with concerns of an injurious
> environment due to the living conditions [in] the home. The
> child[ren were] placed into a safety resource placement
> with the maternal grandmother . . . . Mother was given 10
> days to get the home cleaned. The home has not been
> cleaned up. There is animal feces in every room of the
> home, clothing is piled up in every room, medications are
> left out in children's reach, food & garbage is piled up in
> every room. There is also a concern for improper
> supervision because the children continue to go back up to
> the mother's home which places the children in an
> injurious environment to [their] welfare.

Respondent entered into a DSS family services case plan on 31 May 2016 in

which she agreed to (1) obtain a mental health assessment and comply with all

treatment recommendations; (2) submit a written explanation of why her children

were in DSS custody; (3) complete parenting classes, submit a written report of what

she learned, and incorporate those lessons into her interactions with the children;

(4) obtain and maintain suitable employment; (5) sign a voluntary support agreement and pay child support; (6) obtain and maintain housing free from safety hazards and otherwise suitable for her children; (7) participate in DSS's In-Home Aide Program and work to address issues identified by the aide; (8) maintain regular contact with her social worker; (9) submit to and pass random drug screens; (10) attend all scheduled visitations with her children; and (11) refrain from illegal activity.

At a hearing on 7 June 2016, respondent stipulated to the allegations in the juvenile petitions filed by DSS and consented to an adjudication of neglect. The trial court entered its "Adjudication and Disposition Order" on 26 July 2016, adjudicating respondent's children to be neglected and maintaining them in DSS custody. On 4 April 2017, the trial court established a primary permanent plan of reunification for each child with a secondary plan of adoption for Dora and Jimmy and a secondary plan of custody with a court-approved caretaker for Donald and Charles. After successive hearings reviewing respondent's progress toward reunification, the trial court entered a permanency planning order on 10 September 2018 that changed each child's primary permanent plan to adoption with a secondary plan of custody with a court-approved caretaker.

DSS filed petitions to terminate respondent's parental rights to the children on 29 November 2018. The trial court held a hearing on the petitions for termination on 3 April 2019 and entered orders terminating respondent's parental rights on 11 July 2019. Respondent filed notices of appeal from the termination orders. This Court

subsequently granted respondent's petition for writ of certiorari to review the trial court's 10 September 2018 permanency planning order that eliminated reunification from the children's permanent plans. *See* N.C.G.S. § 7B-1001(a1)(2), (a2) (2019) (prescribing preservation and notice requirements for appeal from an order eliminating reunification as a permanent plan); *see also* N.C. R. App. P. 21(a)(1) (allowing review by writ of certiorari "when the right to prosecute an appeal has been lost by failure to take timely action"). In her brief to this Court, however, respondent does not bring forward any issues related to this 10 September 2018 permanency planning order. *See generally* N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief . . . will be taken as abandoned."). As a result, we have no basis for finding any error in the permanency planning order that was the subject of respondent's petition for writ of certiorari.

In her brief, respondent argues that the trial court erred in adjudicating the existence of grounds to terminate her parental rights under N.C.G.S. § 7B-1111(a). She further contends that the trial court abused its discretion under N.C.G.S. § 7B-1110(a) by concluding that termination of her parental rights was in the best interests of Donald, Jimmy, and Charles.

*Adjudication*

"We review a district court's adjudication [under N.C.G.S. § 7B-1111(a)] 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re N.P.*, 839 S.E.2d 801,

802–03 (N.C. 2020) (quoting *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)); *see also* N.C.G.S. § 7B-1109(f) (2019). Unchallenged findings of fact "are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019). Moreover, we review only those findings needed to sustain the trial court's adjudication. *Id.* at 407, 831 S.E.2d at 58–59.

The issue of whether a trial court's findings of fact support its conclusions of law is reviewed de novo. *See State v. Nicholson*, 371 N.C. 284, 288, 813 S.E.2d 840, 843 (2018). However, an adjudication of any single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will suffice to support a termination order. *In re B.O.A.*, 372 N.C. 372, 380, 831 S.E.2d 305, 311 (2019); *accord In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 132 (1982). Therefore, if this Court upholds the trial court's order in which it concludes that a particular ground for termination exists, then we need not review any remaining grounds. *In re C.J.*, 373 N.C. 260, 263, 837 S.E.2d 859, 861 (2020).

In the present case, the trial court concluded that there were four statutory grounds for terminating respondent's parental rights, including her failure to make reasonable progress under N.C.G.S. § 7B-1111(a)(2). Subsection 7B-1111(a)(2) authorizes termination of parental rights if "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the

circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C.G.S. § 7B-1111(a)(2) (2019).

We agree with the Court of Appeals that an adjudication under N.C.G.S. § 7B-1111(a)(2) requires that a child be " 'left' in foster care or placement outside the home pursuant to a court order" for more than a year at the time the petition to terminate parental rights is filed. *In re A.C.F.*, 176 N.C. App. 520, 527, 626 S.E.2d 729, 734 (2006). "This is in contrast to the nature and extent of the parent's *reasonable progress*, which is evaluated for the duration leading up to the hearing on the motion or petition to terminate parental rights." *Id.* at 528, 626 S.E.2d at 735.

We also agree with the Court of Appeals that a finding that a parent acted "willfully" for purposes of N.C.G.S. § 7B-1111(a)(2) "does not require a showing of fault by the parent." *In re Oghenekevebe*, 123 N.C. App. 434, 439, 473 S.E.2d 393, 398 (1996). " '[A] respondent's prolonged inability to improve her situation, despite some efforts in that direction, will support a finding of willfulness "regardless of her good intentions," ' and will support a finding of lack of progress . . . sufficient to warrant termination of parental rights under section 7B-1111(a)(2)." *In re J.W.*, 173 N.C. App. 450, 465–66, 619 S.E.2d 534, 545 (2005) (quoting *In re B.S.D.S.*, 163 N.C. App. 540, 546, 594 S.E.2d 89, 93 (2004)), *aff'd per curiam*, 360 N.C. 361, 625 S.E.2d 780 (2006).

"[P]arental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-

1111(a)(2)." *In re B.O.A.*, 372 N.C. 372, 384, 831 S.E.2d 305, 313 (2019). However, in order for a respondent's noncompliance with her case plan to support the termination of her parental rights, there must be a "nexus between the components of the court-approved case plan with which [the respondent] failed to comply and the 'conditions which led to [the child's] removal' from the parental home." *Id.* at 385, 831 S.E.2d at 314 (quoting N.C.G.S. § 7B-1111(a)(2)); *see also In re Y.Y.E.T.*, 205 N.C. App. 120, 131, 695 S.E.2d 517, 524 (explaining that a "case plan is not just a check list" and that "parents must demonstrate acknowledgement and understanding of why the juvenile entered DSS custody as well as changed behaviors"), *disc. review denied*, 364 N.C. 434, 703 S.E.2d 150 (2010).

We note that the trial court here entered a separate termination order for each of respondent's children. The findings of fact and conclusions of law supporting the trial court's adjudications are essentially identical in each termination order. In order to facilitate our discussion of the salient matters in this case involving all four of the juveniles, we shall refer therefore to the findings of fact and conclusions of law as enumerated in the termination order entered by the trial court in the child Dora's case.

The trial court's adjudicatory findings recount the reasons for the children's removal from respondent's home on 9 May 2016 and their subsequent adjudication by the trial court as neglected. Specifically, the findings of fact describe the filthy and hazardous conditions in respondent's home, respondent's failure to improve those

conditions when given time to do so, and respondent's violation of the DSS safety plan by retrieving the children from their placement with the maternal grandmother. The findings of fact also list the requirements of respondent's family services case plan signed on 31 May 2016.

The trial court made the following additional findings of fact regarding respondent's conduct after DSS obtained nonsecure custody of her children:

> 14. The Respondent-Mother completed the following items on her plan: she participated in parenting classes; she submitted a written statement concerning what she learned during parenting classes; she paid small amounts of child support; she contacted her social worker on a somewhat regular basis; she attended visitation with the minor child; she passed all drug screens; and, she refrained from illegal activity.
>
> 15. The Respondent-Mother failed to obtain and maintain appropriate housing. The Respondent-Mother's housing has been a consistent concern while the minor child has been in DSS custody.
>
> 16. DSS offered services to the Respondent-Mother through its in-home aide program after she signed her case plan. This program was intended to assist the Respondent-Mother in making improvements to the condition of her home and to make appropriate decisions on behalf of her children.
>
> 17. On multiple occasions, the Respondent-Mother stated that she thought the in-home aide worker was there to clean her house for her. After numerous arguments with the in-home aide worker, DSS closed its in-home aide services at the Respondent-Mother's request.
>
> 18. Although the Respondent-Mother made small improvements to her home, DSS social workers

consistently found that it was unsanitary, cluttered, and unfit for children. The Respondent-Mother lives with a disabled relative, who would leave jars of urine in the home. The Respondent-Mother also had numerous pets that defecated in the home.

19. The Respondent-Mother failed to obtain and maintain consistent employment. She has told DSS that her job is to manage the trailer park adjacent to her home. In late 2018 to early 2019, she worked briefly for a temporary service at Hobes' Hams in North Wilkesboro.

20. The Respondent-Mother was ordered to pay child support for the minor child and her siblings. The Respondent-Mother has made small payments and has consistently maintained a child support arrearage.

. . . .

22. During visits between the minor child, her siblings, and the Respondent-Mother, . . . . [t]he Respondent-Mother . . . consistently made inappropriate comments to the children regarding when they would be returning to her home.

. . . .

24. The Respondent-Mother struggled during visits with age appropriate interactions and conversations with the minor child. . . .

25. The minor child has been in DSS custody since May 2016. . . .

26. The Respondent-Mother failed to make any reasonable progress in correcting the conditions which led to the removal of the minor child from her home.

To the extent respondent does not except to these findings of fact, they are binding on appeal. *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58.

Based on its findings of fact, the trial court concluded that each child had been residing in a "placement outside of the Respondent-Mother's home for more than twelve (12) months and the Respondent-Mother willfully left the minor child in such placement without making any reasonable progress to correct the conditions which led to the removal of the minor child." The determination that respondent acted "willfully" is a finding of fact rather than a conclusion of law. *See, e.g.*, *Pratt v. Bishop*, 257 N.C. 486, 501, 126 S.E.2d 597, 608 (1962). However, the trial court's placement of this finding in its conclusions of law is immaterial to our analysis. *See State v. Icard*, 363 N.C. 303, 308, 677 S.E.2d 822, 826 (2009). We are obliged to apply the appropriate standard of review to a finding of fact or conclusion of law, regardless of the label which it is given by the trial court. *See Burns*, 287 N.C. at 110, 214 S.E.2d at 61–62.

Respondent challenges the trial court's findings of fact that respondent "failed to make any reasonable progress in correcting the conditions which led to the removal of" her children and that she acted "willfully" in this regard. Respondent contends that the evidence showed that she "lacked 'the ability to show reasonable progress' " as a result of the cognitive limitations and personality issues identified by Dr. Nancy F. Joyce in a "Psychological/Parental Fitness Assessment" performed on respondent in October and November of 2017.

Respondent also characterizes the contested factual findings as "irreconcilably inconsistent" with the trial court's additional finding that she lacked the "capability

to provide for the proper care of the minor child[ren] . . . as a result of her mental limitations as found by the examination psychologist Dr. Joyce," as well as the trial court's adjudication of grounds to terminate respondent's parental rights based on the children's status as dependent juveniles under N.C.G.S. § 7B-1111(a)(6). *See* N.C.G.S. § 7B-101(9) (2019) (defining "[d]ependent juvenile"). According to respondent, she "could not simultaneously have lacked the capacity to parent the children" for purposes of N.C.G.S. § 7B-1111(a)(6) "while also willfully failing to take steps to regain custody" for purposes of N.C.G.S. § 7B-1111(a)(2).

The record in this case shows that the children were removed from respondent's home on 9 May 2016 as a result of its "filthy and unsafe condition" as well as respondent's failure to abide by a DSS safety plan that placed the children with their maternal grandmother. Respondent consented to the trial court's adjudication of the children as neglected juveniles based on the conditions in the home and respondent's failure to remedy them. At the time of the termination hearing on 3 April 2019, respondent had met several conditions of her case plan—completing parenting classes, maintaining regular contact with DSS, attending visitations with the children, passing drug screens, and refraining from illegal activity—but had failed to make meaningful progress in improving the conditions of her home. *Cf. In re A.R.A.*, 373 N.C. 190, 198, 835 S.E.2d 417, 423 (2019) (affirming adjudication under N.C.G.S. § 7B-1111(a)(2) despite the respondent's completion of some case plan

requirements where she failed to resolve "the primary reason for the removal of her children—the presence of the father in the home").

Contrary to respondent's assertion, we see no irreconcilable inconsistency between the trial court's finding that respondent willfully failed to make reasonable progress in correcting the conditions that led to the children's removal from her home on 9 May 2016 and the trial court's determination that respondent is incapable of providing proper care and supervision for her four children under N.C.G.S. § 7B-1111(a)(6).

As the Court of Appeals has explained,

> the issue of whether or not the parent is in a position to actually regain custody of the children at the time of the termination hearing is not a relevant consideration under N.C.[G.S.] § 7B-1111(a)(2), since there is no requirement for the respondent-parent to regain custody to avoid termination under that ground. Instead, the court must only determine whether the respondent-parent had made "reasonable progress under the circumstances . . . in correcting those conditions which led to the removal of the juvenile." N.C.[G.S.] § 7B-1111(a)(2). Accordingly, the conditions which led to removal are not required to be corrected completely to avoid termination. Only reasonable progress in correcting the conditions must be shown.

*In re L.C.R.*, 226 N.C. App. 249, 252, 739 S.E.2d 596, 598 (2013). The "reasonable progress" standard enunciated in N.C.G.S. § 7B-1111(a)(2) therefore did not require respondent to completely remediate the conditions that led to the children's removal or to render herself capable of being reunified with her children. In applying this standard, we conclude that the evidence supports the trial court's finding that

respondent acted willfully in failing to make reasonable progress toward correcting the conditions that led to the children's removal from her home.

In her written report,[2] Dr. Joyce diagnosed respondent with a "Mild Intellectual Disability" and an "Unspecified Personality Disorder" and opined, *inter alia*, "that [respondent] lacks the cognitive skills necessary to manage a home as well as the children[-]rearing responsibilities for four children." The trial court accurately summarized the results of respondent's psychological assessment in its findings of fact. As respondent observes, the trial court expressly accepted Dr. Joyce's conclusion that respondent "does not have the capability to provide for the proper care of the [four children] as a result of her mental limitations."

Notwithstanding respondent's cognitive deficits, Dr. Joyce did not find that respondent lacked the ability to clean the home or to maintain it in a condition suitable for children in order to address the principal cause of the children's removal from her home. As the trial court found, Dr. Joyce did report that respondent appeared to lack the capacity to manage a home while simultaneously rearing four children. However, even when respondent was relieved of her child-rearing responsibilities when DSS took the children into nonsecure custody on 9 May 2016, respondent still failed to materially improve the conditions in her home.

---

[2] Although Dr. Joyce was deceased by the time of the termination hearing, the trial court admitted her report into evidence.

The evidence and the uncontested findings of fact show that respondent refused to cooperate with the in-home aide who was provided by DSS to assist respondent in addressing the conditions in the home. For example, when asked why she had refused the in-home aide's services, respondent testified as follows:

> I felt like that she was pushing me a little harder. I understand that she was—yes, I should have listened, but I just . . . . felt like I was being pushed too hard, and I felt like she was staying up in my business all the time wanting —I felt like she was my mother and trying to tell me what to do.

Such evidence establishes that respondent was capable of complying with the important aspects of her case plan.

In light of respondent's refusal to work with the in-home aide provided by DSS and the fact that respondent was afforded almost three years to achieve a home environment suitable for her children, we conclude that the trial court did not err by finding that respondent failed to make reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2) under these conditions and by finding that her failure to do so was willful. *See In re Bishop*, 92 N.C. App. 662, 669, 375 S.E.2d 676, 681 (1989) ("[R]espondent has been afforded almost double the statutory . . . period in which to demonstrate her willingness to correct the conditions which led to the removal of her children. Her failure to do so supports a finding of willfulness regardless of her good intentions."); *see also In re Nolen*, 117 N.C. App. 693, 699–700, 453 S.E.2d 220, 224–25 (1995) (concluding that respondent's "sporadic efforts to improve her situation" did

not preclude a finding of willfulness where she "had more than three and one-half times the statutory period of twelve months in which to take steps to improve her situation, yet she has failed to do so"). In light of the extended length of time that respondent was given to be successful in completing her case plan, the trial court's findings of fact demonstrate that it duly considered respondent's partial completion of her case plan as well as her limited cognitive abilities as diagnosed by Dr. Joyce. *See In re Bishop*, 92 N.C. App. at 669, 375 S.E.2d at 681 (upholding adjudication while acknowledging "respondent's contentions that her inability to improve her situation stems from her mental disability, her poverty, and other personal problems"); *see also In re I.G.C.*, 373 N.C. 201, 206, 835 S.E.2d 432, 435 (2019) (noting that the trial court "considered all of respondent-mother's efforts up to the time of the termination hearing, weighed the evidence before it, and then made findings which showed that respondent-mother . . . had not made reasonable progress"). Consequently, respondent's challenge to the trial court's adjudication is overruled.

Because we hold that the trial court properly adjudicated a ground for terminating respondent's parental rights under N.C.G.S. § 7B-1111(a)(2), we need not review respondent's arguments regarding the three additional grounds for termination found by the trial court. *See In re A.R.A.*, 373 N.C. at 194, 835 S.E.2d at 421; *In re E.H.P.*, 372 N.C. 388, 395, 831 S.E.2d 49, 53 (2019).

## Disposition

Respondent also challenges the trial court's conclusion that it is in the best

interests of Donald, Jimmy, and Charles to terminate her parental rights. Respondent does not contest the trial court's determination with regard to Dora.

At the dispositional stage of a termination proceeding, the trial court must "determine whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019). In doing so, the trial court must "consider the following criteria and make written findings regarding the following that are relevant":

> (1) The age of the juvenile.
> (2) The likelihood of adoption of the juvenile.
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
> (4) The bond between the juvenile and the parent.
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
> (6) Any relevant consideration.

*Id.* Although the trial court must consider each of the factors in N.C.G.S. § 7B-1110(a), written findings of fact are required only "if there is 'conflicting evidence concerning' the factor, such that it is 'placed in issue by virtue of the evidence presented before the [trial] court[.]' " *In re A.R.A.*, 373 N.C. at 199, 835 S.E.2d at 424 (second alteration in original) (quoting *In re H.D.*, 239 N.C. App. 318, 327, 768 S.E.2d 860, 866 (2015)).

The trial court's dispositional findings are binding on appeal if supported by any competent evidence. *In re K.N.K.*, 839 S.E.2d 735, 740 (N.C. 2020). The trial court's determination of a child's best interests under N.C.G.S. § 7B-1110(a) is

reviewed only for abuse of discretion. *In re A.U.D.*, 373 N.C. 3, 6, 832 S.E.2d 698, 700 (2019). "An abuse of discretion is a decision manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." *In re K.N.K.*, 839 S.E.2d at 740 (citation omitted).

Respondent asserts that the trial court failed to comply with N.C.G.S. § 7B-1110(a) because it "did not consider [certain] statutorily mandated factors" in assessing each of her sons' best interests. She specifically contends that "[t]he court did not address [each child's] permanent plan, the bond with his placement, the probability of adoption[,] and whether or not termination would help accomplish the permanent plan." *See* N.C.G.S. § 7B-1110(a)(2)–(3), (5).

We find no merit in respondent's argument. In the termination orders concerning Donald, Jimmy, and Charles, the trial court concluded that "[b]*ased upon the factors set forth in N.C.G.S. § 7B-1110*, it is in the best interest of the minor child for the [respondent's] parental rights to be terminated." (Emphasis added.) Since there was no conflicting evidence about the likelihood of each child's adoption or the facilitation of each child's permanent plan of adoption if respondent's parental rights were terminated, the trial court was not required to make written findings under N.C.G.S. § 7B-1110(a)(2)–(3). *See In re A.R.A.*, 373 N.C. at 200, 835 S.E.2d at 424. Likewise, the absence of any conflicting evidence regarding Charles's strong bond with his prospective adoptive parents obviated the need for written findings on this issue under N.C.G.S. § 7B-1111(a)(5). Finally, because no prospective permanent

placement had been identified for Donald and Jimmy, the factor in N.C.G.S. § 7B-1110(a)(5) did not apply to those two children. *Id.* To the extent that respondent contends that the trial court violated the statutory mandate in N.C.G.S. § 7B-1110(a) as to its determination of the best interests of each juvenile, her argument is overruled.

Respondent also challenges the merits of the trial court's determination that terminating her parental rights was in each child's best interests. According to respondent, "Charles, Jimmy, and Donald had zero adoptive possibilities" due to their "tremendous behavioral problems." With no hope of adoption, she argues that the trial court's decision to terminate her parental rights amounts to a needless and "arbitrary" separation of a mother from her children. *See* N.C.G.S. § 7B-100(4) (2019) (articulating policy goal of "preventing the unnecessary or inappropriate separation of juveniles from their parents"). Respondent notes that she attended all of her scheduled visitations with her children. Moreover, she contends that "Donald and Jimmy wanted to return to live with their mother." Given the strength of the family relationship, respondent submits that the trial court should have maintained the existing arrangement that she had with her sons, which "was working."

Respondent's characterization of the circumstances is inconsistent with both the evidence from the termination hearing and the trial court's uncontested findings of fact. At the time of the termination hearing, Donald was eleven years old, Jimmy was ten years old, and Charles was eight years old. Charles was in a potential

adoptive placement, while Donald and Jimmy were in therapeutic foster homes. When asked at the termination hearing about the likelihood of Charles's adoption if respondent's parental rights were terminated, the DSS adoption social worker testified that adoption "is 100 percent likely."

The DSS adoption social worker acknowledged that Donald and Jimmy "had some pretty significant behavioral problems" when the two children entered DSS custody, but described both juveniles' marked improvement in therapeutic foster care. In responding to the query about Donald's and Jimmy's prospects for being "levelled down" from therapeutic foster care, the DSS adoption social worker said, "I think right now it's just a matter of finding an appropriate possible adoptive home, because their behaviors are so much better. I think that they could easily be levelled down, but just again, need to be a home where they had plenty of the same structure that they needed . . . ."[3] She expressed a preference for placing Donald and Jimmy together and confirmed that DSS planned to move them into an adoptive home "[o]nce a placement is found." Based on this testimony offered by the DSS adoption social worker, respondent's contention that Donald and Jimmy had only a "speculative and remote" chance for adoption is unsupported by the record.[4]

---

[3] The guardian *ad litem* noted Donald's need for "a consistent home with structure, logical consequences, and either an only child or children who are of similar age" as well as Jimmy's need for "a structured and emotionally supportive environment" to address "his attention seeking behaviors."

[4] For this reason, we are unpersuaded by respondent's invocation of the Court of Appeals' decision reversing an order terminating parental rights in *In re J.A.O.*, 166 N.C.

Respondent also mischaracterizes the evidence concerning the bond between her and her two sons. The trial court expressly found that none of respondent's sons had a bond with respondent. Respondent does not except to the trial court's findings of fact as to any of the children and is therefore bound by its determinations. *In re A.R.A.*, 373 N.C. at 195, 835 S.E.2d at 421.

In our assessment of the record, we discern some evidence of a bond between respondent and Jimmy and, to a lesser extent, between respondent and Donald. The guardian *ad litem* described Donald as having "more of [a] bond with the grandmother than [respondent]. His bond with [respondent] seems to be more towards what [she] can get or do for him." Moreover, as respondent relates, Jimmy told the guardian *ad litem* that he "want[ed] to go back home and live with [his] mom

---

App. 222, 601 S.E.2d 226 (2004). The sixteen-year-old boy in *In re J.A.O.* had cycled through nineteen different treatment centers due to his "verbally and physically aggressive and threatening" behavior, and he had been diagnosed with "bipolar disorder, attention deficit hyperactivity disorder, pervasive developmental disorder, borderline intellectual functioning, non-insulin dependent diabetes mellitus, and hypertension." *Id.* at 223, 228, 601 S.E.2d at 227, 230. Adoption was "highly unlikely," and the guardian *ad litem* recommended against terminating the respondent-mother's parental rights. *Id.* at 224, 226, 601 S.E.2d at 228, 229. In light of the devotion shown to the child by his mother, and "balancing the minimal possibilities of adoptive placement against the stabilizing influence, and the sense of identity, that some continuing legal relationship with natural relatives may ultimately bring," the Court of Appeals held that the trial court abused its discretion in terminating the mother's parental rights. *Id.* at 228, 601 S.E.2d at 230 (quoting *In re A.B.E.*, 564 A.2d 751, 757 (D.C. 1989)).

Here, the DSS adoption social worker expressed optimism about Donald and Jimmy's prospects for adoption. The guardian *ad litem* also recommended terminating respondent's parental rights so that Donald and Jimmy could "have a permanent, safe home." The holding of the Court of Appeals in *In re J.A.O.* is thus inapposite.

and uncle." Donald also stated a desire "to go back home, with his mother or grandmother." However, the DSS adoption social worker who supervised the majority of respondent's visitations with the children testified that she "d[id not] see a bond" between respondent and any of the children. As the finder of fact, the trial court was entitled to credit this testimony of the DSS adoption social worker over any conflicting evidence. *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167–68 (2016). Additionally, in light of the trial court's uncontested finding of fact that respondent was incapable of raising her children, the fact that Donald and Jimmy may have expressed a preference to return home is noteworthy but not determinative.

## *Conclusion*

We affirm the adjudications in regard to all four children. Respondent has not challenged the trial court's disposition regarding Dora and based on the evidence in the record and the trial court's findings of fact, the trial court did not abuse its discretion by deciding to terminate respondent's parental rights to Donald, Jimmy, and Charles. All three children had been in foster care for almost three years and had no realistic prospect of being reunified with respondent. Charles was in an adoptive placement, and DSS was hopeful of finding adoptive homes for Donald and Jimmy. *Cf. In re A.R.A.*, 373 N.C. at 200, 835 S.E.2d at 424 ("[T]he absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar to terminating parental rights." (alteration in original) (quoting *In re D.H.*, 232 N.C. App. 217, 223, 753 S.E.2d 732, 736 (2014))). Contrary to respondent's assertion,

leaving her sons in their current foster placements with periodic visitation by respondent was not "working" as a "plan." This arrangement was not only contrary to the permanent plan established by the trial court, it also served to deny to the juveniles the prospect of "a safe, permanent home within a reasonable amount of time" as contemplated by the Juvenile Code. N.C.G.S. § 7B-100(5). Accordingly, we affirm the termination orders.

AFFIRMED.